**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STEVE KLEIN, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA, ROSALIND G. BREWER, GINGER GRAHAM, TIMOTHY C. WENTWORTH, JAMES KEHOE, and MANMOHAN MAHAJAN, | |
| Defendants. | |

Plaintiff Steve Klein ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Walgreens common stock between April 2, 2020 and January 16, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Walgreens operates as a healthcare, pharmacy, and retail company in the U.S., the United Kingdom, Germany, and internationally. The Company's operations are conducted through three reportable segments: U.S. Retail Pharmacy[1], International, and U.S. Healthcare. The U.S. Retail Pharmacy segment includes the Walgreens business, which includes, among other things, the operations of retail drugstores, health and wellness services, and specialty and home delivery pharmacy services. A significant percentage of sales for the U.S. Retail Pharmacy segment is derived from the sale of prescription drugs, the majority of which are reimbursed by third-party payors, including federal healthcare programs.

3.     In connection with its sale of prescription drugs, Walgreens must comply with various federal statutes, including the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "Controlled Substances Act" or "CSA"), 21 U.S.C. §§ 801-904, which was enacted by Congress to prevent the diversion of controlled substances. Under the CSA, all registrants, including pharmacies, are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances" and controlled substances may be dispensed only

---

[1] As detailed herein, Walgreens has also referred to the U.S. Retail Pharmacy segment as "Retail Pharmacy USA" and the "United States Segment."

pursuant to prescriptions that are effective—*i.e.*, "for a legitimate medical purpose" and issued "by an individual practitioner acting in the usual course of his professional practice." *See* 21 C.F.R. § 1306.04(a). Further, when seeking reimbursement for these drugs from federal healthcare programs, Walgreens must submit accurate claims to avoid incurring penalties under the False Claims Act of 1863 (the "False Claims Act" or "FCA"), 31 U.S.C. §§ 3729-33, the federal government's primary litigation tool in combating fraud against the government. Specifically, the FCA provides that anyone who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the U.S. for damages. 31 U.S.C. § 3279(a)(1)(A)-(B).

4. Compliance with the CSA and FCA is particularly relevant to Walgreens' operations in the context of the U.S. opioid epidemic. Over the last two decades, overprescription, overuse and abuse of opioids has developed into a nationwide public health crisis that has ravaged communities across the U.S. In 2017, the opioid crisis was declared a public health emergency under section 319 of the Public Health Service Act, and that declaration was renewed most recently in June 2024. According to the Centers for Disease Control and Prevention, more than 645,000 people in the U.S. have died from overdoses involving opioids since the epidemic began, and non-fatal opioid overdoses have placed significant burdens on governments, health systems, and families. In response to this crisis, Walgreens has described itself as "a leader in providing education and resources, as well as implementing best-in-class policies and procedures, to help combat opioid misuse and abuse." Moreover, as part of its ostensible commitment to Environmental, Social and Governance ("ESG") progress, the Company has claimed to be "proud

of its health-centered sustainability strategy that focuses on healthy communities, a healthy planet, a healthy and inclusive workplace and a sustainable marketplace."

5.      Notwithstanding these representations, Walgreens has been the subject of multiple legal proceedings in connection with its contributions to the U.S. opioid epidemic, including a 2013 settlement (the "2013 Agreement") reached with U.S. Department of Justice ("DOJ") and the U.S. Drug Enforcement Administration in which the Company acknowledged its failure to comply with the CSA when Walgreens failed to prevent the diversion—*i.e.* the transfer of any legally prescribed controlled substance from the individual for whom it was prescribed to another person for any illicit use—of certain opioids for abuse and illegal black market sales.  Similarly, in May 2022, Walgreens announced that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state.  Just months later, in November 2022, the Company announced that it had agreed in principle to a multi-state opioid settlement framework to resolve claims that Walgreens mishandled prescriptions of opioid painkillers, pursuant to which Walgreens would make up to approximately $4.95 billion in remediation payments to be paid out over 15 years.  In April 2024, the City of Philadelphia announced that it had reached a settlement agreement in its 2021 lawsuit against Walgreens for the Company's role in supplying and perpetuating the opioid addiction crisis in Philadelphia, pursuant to which Walgreens would pay the city $110 million in compensation over five years.  As recently as September 2024, Walgreens reached a settlement with the City of Baltimore to resolve claims against the Company for its role in fueling the opioid epidemic in Baltimore, pursuant to which Walgreens agreed to pay the city $80 million.

6.     Consequently, Walgreens has made various commitments to implement measures designed to detect and prevent the diversion of controlled substances.  For example, pursuant to the 2013 Agreement, Walgreens stated that it would train its pharmacists on identifying red flags of potential diversion to ensure compliance with the CSA and would maintain a "Department of Pharmaceutical Integrity" to coordinate its compliance efforts related to controlled substances. However, as investors would subsequently learn, Walgreens continued to engage in widespread violations of the CSA and FCA in connection with its sales of prescription medications.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to the Company's purported commitment to improved regulatory compliance, Walgreens continued to engage in widespread violations of federal law governing the dispensation of prescription medication and reimbursement for the same; (ii) the foregoing conduct, when revealed, would subject Walgreens to a heightened risk of further regulatory scrutiny, civil liability, and reputational harm; (iii) Walgreens' revenues from the sale of prescription medications were unsustainable to the extent that they derived from unlawful conduct; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.     On January 17, 2025, the DOJ announced the filing of a civil complaint (the "DOJ Complaint") alleging that Walgreens "dispensed millions of unlawful prescriptions in violation of the Controlled Substances Act (CSA) and then sought reimbursement for many of these prescriptions from various federal health care programs in violation the False Claims Act (FCA)."  Specifically, the DOJ's "complaint alleges that, from approximately August 2012 through the present, Walgreens knowingly filled millions of prescriptions for controlled substances

that lacked a legitimate medical purpose, were not valid, and/or were not issued in the usual course of professional practice", including "prescriptions for dangerous and excessive quantities of opioids, prescriptions for early refills of opioids and prescriptions for the especially dangerous and abused combination of drugs known as the 'trinity,' which is made up of an opioid, a benzodiazepine and a muscle relaxant."  In addition, the DOJ Complaint expressly alleged that Walgreens was "aware of its obligation to exercise corresponding responsibility" and that its business practices were at odds with earlier commitments to "implement or maintain a variety of compliance measures moving forward."

9.      Following the DOJ's announcement, Walgreens' stock price fell $1.56 per share, or 12.06%, over the following two trading sessions, to close at $11.37 per share on January 21, 2025.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

<u>**JURISDICTION AND VENUE**</u>

11.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Walgreens is headquartered in this Judicial District,

Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

15.     Plaintiff, as set forth in the attached Certification, acquired Walgreens common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Walgreens is a Delaware corporation with principal executive offices located at 108 Wilmot Road, Deerfield, Illinois 60015.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBA."

17.     Defendant Stefano Pessina ("Pessina") served as Walgreens' Chief Executive Officer ("CEO") from prior to the start of the Class Period until March 2021.

18.     Defendant Rosalind G. Brewer ("Brewer") served as Walgreens' CEO from March 2021 until September 2023.

19.     Defendant Ginger Graham ("Graham") served as Walgreens' Interim CEO from September 2023 until October 2023.

20.     Defendant Timothy C. Wentworth ("Wentworth") has served as Walgreens' CEO since October 2023.

21.     Defendant James Kehoe ("Kehoe") served as Walgreens' Chief Financial Officer ("CFO") from prior to the start of the Class Period until July 2023.

22.     Defendant Manmohan Mahajan ("Mahajan") has served as Walgreens' CFO since July 2023.

23.     Defendants Pessina, Brewer, Graham, Wentworth, Kehoe, and Mahajan are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Walgreens' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Walgreens' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Walgreens, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     Walgreens and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Walgreens operates as a healthcare, pharmacy, and retail company in the U.S., the United Kingdom, Germany, and internationally.  The Company's operations are conducted through three reportable segments: U.S. Retail Pharmacy, International, and U.S. Healthcare.  The

U.S. Retail Pharmacy segment includes the Walgreens business, which includes, among other things, the operations of retail drugstores, health and wellness services, and specialty and home delivery pharmacy services. A significant percentage of sales for the U.S. Retail Pharmacy segment is derived from the sale of prescription drugs, the majority of which are reimbursed by third-party payors, including federal healthcare programs.

27.      In connection with its sale of prescription drugs, Walgreens must comply with various federal statutes, including the CSA, 21 U.S.C. §§ 801-904, which was enacted by Congress to prevent the diversion of controlled substances. Under the CSA, all registrants, including pharmacies, are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances" and controlled substances may be dispensed only pursuant to prescriptions that are effective—*i.e.*, "for a legitimate medical purpose" and issued "by an individual practitioner acting in the usual course of his professional practice." *See* 21 C.F.R. § 1306.04(a). Further, when seeking reimbursement for these drugs from federal healthcare programs, Walgreens must submit accurate claims to avoid incurring penalties under the FCA, 31 U.S.C. §§ 3729-33, the federal government's primary litigation tool in combating fraud against the government. Specifically, the FCA provides that anyone who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the U.S. for damages. 31 U.S.C. § 3279(a)(1)(A)-(B).

**Materially False and Misleading Statements Issued During the Class Period**

28.      The Class Period begins on April 2, 2020, when Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational performance for the fiscal quarter ended February 29, 2020 (the "Q2 2020 10-Q"). The Q2 2020 10-Q advised

investors that Walgreens' Retail Pharmacy USA segment accounted for approximately $27.245 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 213 million prescriptions within its Retail Pharmacy USA segment for the quarter.

29.     Appended to the Q2 2020 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pessina and Kehoe, attesting that "[t]he information contained in the [Q2 2020 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

30.     On July 9, 2020, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended May 31, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q advised investors that Walgreens' Retail Pharmacy USA segment accounted for approximately $27.357 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 196.9 million prescriptions within its Retail Pharmacy USA segment for the quarter. In addition, appended to the Q3 2020 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Pessina and Kehoe.

31.     On October 15, 2020, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2020 (the "2020 10-K"). In providing an overview of the Company, the 2020 10-K stated, in relevant part:

> Walgreens [. . .] is a global leader in retail and wholesale pharmacy, touching millions of lives every day through dispensing and distributing medicines, and through its convenient retail locations, digital platforms and health and beauty products with sales of $139.5 billion in the fiscal year ended August 31, 2020. The Company has more than 100 years of trusted healthcare heritage and innovation in community pharmacy and pharmaceutical wholesaling. ***Walgreens Boots***

*Alliance's purpose is to help people across the world lead healthier and happier lives. Walgreens Boots Alliance is proud of its contributions to healthy communities, a healthy planet, an inclusive workplace and a sustainable marketplace.*[2]

32.     Further, in providing an overview of Walgreens' Retail Pharmacy USA segment, the 2020 10-K stated, in relevant part:

The Company is focused on creating a neighborhood health destination and a more modern pharmacy aligned to a wider range of healthcare services. Significant investments in fiscal 2021 are expected to accelerate the Company's customer-centric approach, with specific focus on transforming omni-channel capabilities and offerings across retail and healthcare. *The Company's services help improve health outcomes for patients and manage costs for payers, including employers, managed care organizations, health systems, PBM companies and the public sector.* The Company utilizes its retail network as a channel to provide health and wellness services to its customers and patients, as illustrated by the Company's ability to play a significant role in providing flu vaccines and other immunizations. Additionally, through our strategic partnership strategy, our key collaborations aim to develop new health care delivery models and to improve access to advanced healthcare technologies and solutions. We have taken further steps to develop our neighborhood health destinations, working with our strategic partners such as VillageMD to provide an integrated primary care and pharmacy model that aims to drive better health outcomes, reduce costs and provide a differentiated patient experience to the communities we serve.

33.     In addition, with respect to corporate governance, the 2020 10-K stated, in relevant part:

The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that *incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations*. The Company has also adopted a Code of Ethics for CEO and Financial Executives. This Code applies to and has been signed by the Chief Executive Officer, the Chief Financial Officer and the Chief Accounting Officer.

34.     With respect to governmental regulation and other legal requirements, the 2020 10-K stated, in relevant part:

---

[2] All emphases included herein are added unless otherwise indicated.

Untimely compliance or noncompliance with applicable laws and regulations could result in the imposition of civil and criminal penalties that could adversely affect the continued operation of our businesses, including: suspension of payments from government programs; loss of required government certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the United States and the National Health Service in the United Kingdom; loss of licenses; and significant fines or monetary penalties. Any failure to comply with applicable regulatory requirements in the United States or in any of the countries in which we operate could result in significant legal and financial exposure, damage to our reputation and brand, and have a material adverse effect on our business operations, financial condition and results of operations.

This was plainly a catch-call provision not sufficiently tailored to meet the known and/or foreseeable risks facing the Company.

35. Finally, the 2020 10-K also advised investors that Walgreens' Retail Pharmacy USA segment accounted for approximately $107.701 billion in sales for the year, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 818 million prescriptions within its Retail Pharmacy USA segment for the year.

36. Appended to the 2020 10-K as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Pessina and Kehoe.

37. On January 7, 2021, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2020 (the "Q1 2021 10-Q"). The Q1 2021 10-Q advised investors that Walgreens' Retail Pharmacy USA segment accounted for approximately $27.163 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 204.6 million prescriptions within its Retail Pharmacy USA segment for the quarter. In addition, appended to the Q1 2021 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Pessina and Kehoe.

38.     On February 10, 2021, Walgreens issued a press release announcing the release of its 2020 Corporate Social Responsibility Report (the "2020 CSR Report"). With respect to opioid abuse prevention, the 2020 CSR Report stated, in relevant part:

> **Opioid abuse continues to devastate families and entire communities in the U.S. Data from the Centers for Disease Control and Prevention (CDC) showed the opioid abuse death rate rose in 2019 because of increased use of illicit opioids such as fentanyl. Our stakeholders expect us to play a significant role in helping to address the U.S. opioid epidemic, given our influence as a leader in the retail pharmacy industry, our scale of operations and our expansive reach across local communities. *Walgreens is focused on collaborative solutions, working with government and business partners on drug take back and addiction mitigation initiatives. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our expanding, multi-million dollar effort to help combat overdose-related deaths*.**
>
> We have worked with representatives at all levels of government, numerous public agencies, research organizations and industry groups to drive and influence legislation related to prescription opioids. Among solutions we support are mandatory e-prescriptions, especially for prescription opioids, which can enhance security and curb fraud, waste and abuse; a nationwide prescription drug monitoring program (PDMP); and seven-day supply limits for acute prescription opioid prescribing.

39.     On March 31, 2021, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended February 28, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q advised investors that Walgreens' United States Segment[3] accounted for approximately $27.344 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 195.3 million prescriptions within its United States Segment for the quarter. In

_____

[3] The Q2 2021 10-Q advised investors that "as of the second quarter of fiscal year 2021, the Company no longer has the Pharmaceutical Wholesale segment and is aligned into two reportable segments: United States and International." Further, the Q2 2021 10-Q indicated that the Company's United States Segment "includes the Walgreens business which includes the operations of retail drugstores, health and wellness services, and mail and central specialty pharmacy services, and its equity method investment in AmerisourceBergen."

addition, appended to the Q2 2021 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

40.     On April 23, 2021, the Company issued a press release entitled "Walgreens Encourages All Americans to Participate in National Prescription Drug Take Back Day."  The press release stated, in relevant part, that "Walgreens stores throughout the country will serve as a drop-off point for law enforcement to collect unwanted, unused or expired medications for safe disposal," and touted that the Company is "leading the fight against prescription drug abuse with programs to help curb the misuse of medications and reduce the rise in overdose deaths."

41.     On July 1, 2021, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended May 31, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q advised investors that Walgreens' United States Segment accounted for approximately $28.743 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 214.1 million prescriptions within its United States Segment for the quarter.  In addition, appended to the Q3 2021 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

42.     On October 14, 2021, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2021 (the "2021 10-K").  The 2021 10-K contained substantively similar descriptions of the Company, its reportable segments, and code of ethics as discussed, *supra*, in ¶¶ 31-33, and included a substantively similar catch-all provision related to governmental regulation and other legal requirements as discussed, *supra*, in ¶ 34, that was not sufficiently tailored to meet the known and/or foreseeable risks facing the Company.

43.     Further, the 2021 10-K advised investors that Walgreens' United States Segment accounted for approximately $112.005 billion in sales for the year, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 827.5 million prescriptions within its United States Segment for the year.

44.     Appended to the 2021 10-K as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

45.     That same day, Walgreens hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  During the scripted portion of the Q4 2021 Earnings Call, Defendant Brewer stated, in relevant part:

> ***[W]e evolved and updated our Company's purpose, vision, and value to be our guiding light as we move forward and to influence our decisions, both big and small. As you see here, our new purpose statement, more joyful lives through better health. We're referring here to physical, mental, and emotional health.*** And that can come in the form of a life-saving vaccination or can just be as simple as providing a great shade of lipstick that lifts one's spirits. Our purpose is our why, our enduring reason for being, and the difference we want to make in the world.

46.     On January 6, 2022, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2021 (the "Q1 2022 10-Q").  The Q1 2022 10-Q advised investors that Walgreens' United States Segment accounted for approximately $28.032 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 218 million prescriptions within its United States Segment for the quarter.   In addition, appended to the Q1 2022 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

47. On February 22, 2022, Walgreens issued a press release announcing the release of the Company's fiscal 2021 ESG Report (the "2021 ESG Report"). With respect to opioid abuse prevention, the 2021 ESG Report stated, in relevant part:

> Our stakeholders expect us to play a significant role in helping to address the U.S. opioid epidemic, given our influence as a leader in the retail pharmacy industry, our scale of operations and our expansive reach across local communities. *Walgreens is focused on collaborative solutions, working with government and business partners on drug take back and addiction mitigation initiatives. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our multi-million dollar effort to help combat overdose-related deaths.*

> We have worked with representatives at all levels of government, numerous public agencies, research organizations and industry groups to drive and influence legislation related to prescription opioids.

> *Walgreens maintains a Good Faith Dispensing policy, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. This policy requires a pharmacist to evaluate the patient, the prescriber, the drug, the applicable law and the surrounding circumstances prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.*

> Walgreens supports CDC recommendations by educating patients about naloxone when they are dispensed high doses of certain prescription opioids and who may be at risk of accidental overdose.

48. On March 31, 2022, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended February 28, 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q advised investors that Walgreens' United States Segment accounted for approximately $27.667 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 203.3 million prescriptions within its United States Segment for the quarter. In

addition, appended to the Q2 2022 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

49.     On May 5, 2022, Walgreens issued a press release announcing that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state.  However, that same press release stated, in relevant part:

> *The settlement includes no admission of wrongdoing or liability by Walgreens*.

> "As the largest pharmacy chain in the state, we remain focused on and committed to being part of the solution, and believe this resolution is in the best interest of all parties involved and the communities we serve across Florida," said Danielle Gray, executive vice president and global chief legal officer, Walgreens Boots Alliance, Inc. "*Our pharmacists are dedicated healthcare professionals who live and work in the communities they serve, and play a critical role in providing education and resources to help combat opioid misuse and abuse*."

> As one of Florida's leading healthcare providers, *Walgreens has taken a number of actions to prevent and respond to the opioid crisis, while continuing to serve patients, including*:

> - *Providing patient education on safe opioid use*

> - Making life-saving Naloxone, the opioid overdose reversal medication, available in all Walgreens pharmacies nationwide

> - Providing safe and convenient medication disposal kiosks available at 1,400 Walgreens stores, along with other safe disposal options at all other Walgreens locations

> - *Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose*

> - Stopping self-distribution of opioids and all pharmaceuticals to Walgreens stores in 2014[.]

50.     On June 30, 2022, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended May 31, 2022 (the "Q3 2022 10-Q").  The Q3 2022 10-Q advised investors that Walgreens' United States

Segment accounted for approximately $26.695 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 201.5 million prescriptions within its United States Segment for the quarter. In addition, appended to the Q3 2022 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

51.     On October 13, 2022, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2022 (the "2022 10-K"). The 2022 10-K contained substantively similar descriptions of the Company, its reportable segments, and code of ethics as discussed, *supra*, in ¶¶ 31-33, and included a substantively similar catch-all provision related to governmental regulation and other legal requirements as discussed, *supra*, in ¶ 34, that was not sufficiently tailored to meet the known and/or foreseeable risks facing the Company.

52.     Further, the 2022 10-K advised investors that the U.S. Retail Pharmacy[4] segment accounted for approximately $109.078 billion in sales for the year, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 819.6 million prescriptions within the U.S. Retail Pharmacy segment for the year.

53.     Appended to the 2022 10-K as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

54.     On October 27, 2022, the Company issued a press release entitled "Walgreens Encourages Everyone to Take Part in National Drug Take Back Day Oct. 29" which stated, in

---

[4] The 2022 10-K stated that "[i]n the fourth quarter of fiscal 2022, the Company changed the name of two reportable segments to better align with the Company's business activities, structure and strategy. The 'United States' segment was renamed to 'U.S. Retail Pharmacy[.]'"

relevant part, that "Walgreens is leading the fight against prescription drug abuse with programs to help curb the misuse of medications and reduce the rise in overdose deaths[.]"

55.     On November 2, 2022, the Company issued a press release announcing that it had agreed in principle to a multi-state opioid settlement framework to resolve claims that Walgreens mishandled prescriptions of opioid painkillers.  The press release stated that "[u]nder these frameworks, the company expects to settle all opioid claims against it by participating states, subdivisions and tribes, for up to approximately $4.95 billion in remediation payments to be paid out over 15 years."  However, that same press release stated, in relevant part:

*The settlement frameworks include no admission of wrongdoing or liability by the company*.

***

"As one of the largest pharmacy chains in the nation, we remain committed to being a part of the solution, and this settlement framework will allow us to keep our focus on the health and wellbeing of our customers and patients, while making positive contributions to address the opioid crisis. We believe this is in the best interest of the company and our stakeholders at this time, and allows our pharmacists, dedicated healthcare professionals who live and work in the communities they serve, to continue playing a critical role in providing education and resources to help combat opioid misuse and abuse."

*Walgreens has taken a number of actions over many years to respond to the opioid crisis, while continuing to serve patients, including*:

- *Providing ongoing patient education on safe opioid use*

- Making life-saving Naloxone, the opioid overdose reversal medication, available in all Walgreens pharmacies nationwide (nearly 9,000 stores total)

- Providing safe and convenient medication disposal options at all Walgreens locations, including in-store kiosks at more than 1,400 stores

- Implementing time delay safes in nearly all Walgreens locations across the U.S. and Puerto Rico to help combat theft and drug diversion

- *Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose*[.]

56.     On January 5, 2023, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2022 (the "Q1 2023 10-Q").  The Q1 2023 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $27.204 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 211.3 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q1 2023 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

57.     On March 10, 2023, Walgreens issued a press release announcing the release of the Company's fiscal 2022 ESG report (the "2022 ESG Report").  With respect to "prescription misuse prevention," the 2022 ESG report stated, in relevant part:

> **Prescription misuse prevention is a priority for our pharmacy staff. Our status as a leader in the retail pharmacy industry and our expansive reach across communities allow us to play a significant role in addressing the opioid epidemic. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our multimillion-dollar effort to help combat overdose-related deaths.**
>
> ***Walgreens maintains a Good Faith Dispensing policy, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. This policy requires a pharmacist to evaluate the patient, prescriber, drug, applicable law and surrounding circumstances prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.***
>
> Walgreens supports CDC recommendations by educating patients about naloxone, a lifesaving overdose antidote, when they are dispensed high doses of certain prescription opioids and who may be at risk of accidental overdose.

58.     On March 28, 2023, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended

February 28, 2023 (the "Q2 2023 10-Q"). The Q2 2023 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $27.577 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 197.3 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q2 2023 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

59. On June 27, 2023, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended May 31, 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $27.866 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 199.9 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q3 2023 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Brewer and Kehoe.

60. On October 12, 2023, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2023 (the "2023 10-K"). The 2023 10-K contained substantively similar descriptions of the Company, its reportable segments, and code of ethics as discussed, *supra*, in ¶¶ 31-33, and included a substantively similar catch-all provision related to governmental regulation and other legal requirements as discussed, *supra*, in ¶ 34, that was not sufficiently tailored to meet the known and/or foreseeable risks facing the Company.

61. In addition, with respect to the Company's ESG progress, the 2023 10-K stated, in relevant part, "the Company is proud of its health-centered sustainability strategy that focuses on

healthy communities, a healthy planet, a healthy and inclusive workplace and a sustainable marketplace. Walgreens Boots Alliance is a participant in the United Nations Global Compact and adheres to its principles-based approach to responsible business."

62. Further, the 2023 10-K advised investors that the U.S. Retail Pharmacy segment accounted for approximately $110.314 billion in sales for the year, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 800.8 million prescriptions within the U.S. Retail Pharmacy segment for the year.

63. Appended to the 2023 10-K as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Graham and Mahajan.

64. On January 4, 2024, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2023 (the "Q1 2024 10-Q"). The Q1 2024 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $28.944 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 207.2 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q1 2024 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Wentworth and Mahajan.

65. On January 26, 2024, Walgreens issued a press release announcing the release of the Company's fiscal 2023 ESG Report (the "2023 ESG Report"). The 2023 ESG Report contained a substantively similar description of "prescription misuse prevention" as discussed, *supra*, in ¶ 57.

66. On March 28, 2024, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended

February 29, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $28.861 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 198.8 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q2 2024 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Wentworth and Mahajan.

67. On June 27, 2024, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended May 31, 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $28.503 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 196.9 million prescriptions within the U.S. Retail Pharmacy segment for the quarter. In addition, appended to the Q3 2024 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Wentworth and Mahajan.

68. On October 15, 2024, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2024 (the "2024 10-K"). The 2024 10-K contained substantively similar descriptions of the Company, its reportable segments, its code of ethics, and ESG progress, as discussed, *supra*, in ¶¶ 31-33 and 61, and included a substantively similar catch-all provision related to governmental regulation and other legal requirements as discussed, *supra*, in ¶ 34, that was not sufficiently tailored to meet the known and/or foreseeable risks facing the Company.

69. Further, the 2024 10-K advised investors that the U.S. Retail Pharmacy segment accounted for approximately $115.778 billion in sales for the year, "principally derived from the

sale of prescription drugs and a wide assortment of retail products[,]" and reported 796.4 million prescriptions within the U.S. Retail Pharmacy segment for the year.

70.     Appended to the 2024 10-K as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Wentworth and Mahajan.

71.     That same day, Walgreens hosted an earnings call with investors and analysts to discuss the Company's Q4 2024 results (the "Q4 2024 Earnings Call").  During the scripted portion of the Q4 2024 Earnings Call, Defendant Wentworth stated, in relevant part:

> [W]e have conducted a thorough strategic review. Coming out of this work, we are an organization focused on two guiding principles with clear operational and financial priorities. The first guiding principle relates to our operating model. ***WBA is reorienting to its legacy strength as a retail pharmacy-led company. This reorientation allows us to leverage our key strategic assets of consumer trust, convenience and relevance***.
>
> ***Our position of trust stems from the millions of face-to-face interactions our consumers have with our pharmacy personnel every day.*** And we will continue to take actions now and for the long-term to be the first choice for retail pharmacy and health services. Having earned our consumers' trust, indeed, our reason to exist, we also want to be accessible and convenient, but we need to be appropriately sized. Consequently, we are announcing an expanded footprint optimization program. We have over 8,000 stores, of which the majority, approximately 6,000, are profitable. ***This solid base supports our conviction in a retail pharmacy led model that is relevant to our consumers, and we intend to invest in these stores over the next several years***.

72.     On January 10, 2025, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2024 (the "Q1 2025 10-Q").  The Q1 2025 10-Q advised investors that the U.S. Retail Pharmacy segment accounted for approximately $30.866 billion in sales for the quarter, "principally derived from the sale of prescription drugs and a wide assortment of retail products[,]" and reported 207.3 million prescriptions within the U.S. Retail Pharmacy segment for the quarter.

In addition, appended to the Q1 2025 10-Q as exhibits were SOX certifications substantively similar to those discussed, *supra*, in ¶ 29, signed by Defendants Wentworth and Mahajan.

73.     The statements referenced in ¶¶ 28-72 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to the Company's purported commitment to improved regulatory compliance, Walgreens continued to engage in widespread violations of federal law governing the dispensation of prescription medication and reimbursement for the same; (ii) the foregoing conduct, when revealed, would subject Walgreens to a heightened risk of further regulatory scrutiny, civil liability, and reputational harm; (iii) Walgreens' revenues from the sale of prescription medications were unsustainable to the extent that they derived from unlawful conduct; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

74.     On January 17, 2025, the DOJ announced the filing of a civil complaint against Walgreens.  In a press release announcing the lawsuit, entitled "Justice Department Files Nationwide Lawsuit Alleging Walgreens Knowingly Filled Millions of Prescriptions that Lacked a Legitimate Medical Purpose," the DOJ stated, in relevant part:

> "This lawsuit seeks to hold Walgreens accountable for the many years that it failed to meet its obligations when dispensing dangerous opioids and other drugs," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Justice Department's Civil Division. "Our complaint alleges that Walgreens pharmacists filled millions of controlled substance prescriptions with clear red flags that indicated the prescriptions were highly likely to be unlawful, and that Walgreens systematically pressured its pharmacists to fill prescriptions, including controlled substance prescriptions, without taking the time needed to confirm their validity. These practices allowed millions of opioid pills and other controlled substances to flow illegally out of Walgreens stores."

The government's complaint alleges that, from approximately August 2012 through the present, Walgreens knowingly filled millions of prescriptions for controlled substances that lacked a legitimate medical purpose, were not valid, and/or were not issued in the usual course of professional practice. Among the millions of unlawful prescriptions that Walgreens allegedly filled were prescriptions for dangerous and excessive quantities of opioids, prescriptions for early refills of opioids and prescriptions for the especially dangerous and abused combination of drugs known as the "trinity," which is made up of an opioid, a benzodiazepine and a muscle relaxant.

The complaint alleges that Walgreens pharmacists filled these prescriptions despite clear "red flags" that indicated that the prescriptions were highly likely to be unlawful. Walgreens allegedly ignored substantial evidence from multiple sources that its stores were dispensing unlawful prescriptions, including from its own pharmacists and internal data.

The complaint further alleges that Walgreens systematically pressured its pharmacists to fill prescriptions quickly without taking the time needed to confirm each prescription's validity. Walgreens also allegedly deprived its pharmacists of crucial information, including by preventing pharmacists from warning one another about certain prescribers.

The complaint alleges that by knowingly filling unlawful prescriptions for controlled substances, Walgreens violated the CSA and, where Walgreens sought reimbursement from federal health care programs, also violated the FCA. The complaint alleges that Walgreens's actions helped to fuel the prescription opioid crisis and that, in some particularly tragic instances, patients died after overdosing on opioids shortly after filling unlawful prescriptions at Walgreens. If Walgreens is found liable, it could face civil penalties of up to $80,850 for each unlawful prescription filled in violation of the CSA and treble damages and applicable penalties for each prescription paid by federal programs in violation of the FCA. The court also may award injunctive relief to prevent Walgreens from committing further CSA violations.

75.     The DOJ Complaint expressly alleged that Walgreens was "aware of its obligation to exercise corresponding responsibility" and that its business practices were at odds with earlier commitments to "implement or maintain a variety of compliance measures moving forward," stating, for example:

Pharmacies serve as critical gatekeepers against the diversion of controlled substances. Federal law vests pharmacists with the authority to dispense controlled substances pursuant to a valid prescription. It also imposes on pharmacists a

corresponding responsibility to confirm the validity of a prescription before dispensing the controlled substances prescribed.

For years, even as the opioid epidemic ravaged this country, Walgreens failed to meet that responsibility.

\*\*\*

Moreover, Walgreens for years refused to implement a system for blocking Walgreens pharmacies from filling prescriptions written by practitioners that Walgreens knew regularly wrote illegal opioid prescriptions, even as Walgreens pharmacists requested such action, and even as some of Walgreens's major competitors instituted systems enabling them to block such prescribers.

\*\*\*

As part of [a] 2011 Agreement [reached with the DEA to resolve certain administrative actions arising from alleged violations of Walgreens's responsibilities under the CSA], Walgreens agreed to maintain a compliance program to detect and prevent the diversion of controlled substances, including by regularly training Walgreens pharmacy employees on their responsibilities under the CSA and by implementing "procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills."

\*\*\*

[Pursuant to the 2013 Agreement,] Walgreens also agreed to implement or maintain a variety of compliance measures moving forward.

These "Prospective Compliance" provisions, which were in effect from June 2013 through June 2016, required Walgreens to, among other things, maintain a compliance program to detect and prevent the diversion of controlled substances and to provide training to its pharmacists to ensure compliance with the CSA and its implementing regulations.

Walgreens agreed to maintain a "Department of Pharmaceutical Integrity" to coordinate its compliance efforts related to controlled substances and to instruct its pharmacists and supervisory personnel to contact the Department of Pharmaceutical Integrity to address issues arising with specific patients or physicians.

Walgreens also agreed to train its pharmacists on identifying red flags of potential diversion.

The policies Walgreens adopted also reflect its understanding that its pharmacists are required to recognize and resolve red flags prior to dispensing controlled substances. For example, Walgreens developed a "Good Faith Dispensing" (GFD) Policy to guide pharmacists in exercising their corresponding responsibility when filling controlled substances.

76.     Following the DOJ's announcement, Walgreens' stock price fell $1.56 per share, or 12.06%, over the following two trading sessions, to close at $11.37 per share on January 21, 2025.

77.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

78.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Walgreens' common stock, Defendant Brewer enriched herself by selling nearly $2.4 million in shares of Walgreens stock, while Defendant Kehoe enriched himself by selling over $4.3 million in shares of Walgreen stock.

79.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's common stock during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Walgreens common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

81.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Walgreens common stock were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Walgreens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Walgreens;

- whether the Individual Defendants caused Walgreens to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Walgreens common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

86. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Walgreens common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold Walgreens common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

87. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

88. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

89. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

91. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walgreens common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Walgreens common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

92. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Walgreens common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Walgreens' finances and business prospects.

93. By virtue of their positions at Walgreens, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

94.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Walgreens, the Individual Defendants had knowledge of the details of Walgreens' internal affairs.

95.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Walgreens.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Walgreens' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Walgreens common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Walgreens' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Walgreens common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

96.     During the Class Period, Walgreens common stock were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Walgreens common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Walgreens common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Walgreens common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

97.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

99.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     During the Class Period, the Individual Defendants participated in the operation and management of Walgreens, and conducted and participated, directly and indirectly, in the conduct of Walgreens' business affairs. Because of their senior positions, they knew the adverse non-public information about Walgreens' misstatement of income and expenses and false financial statements.

101.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Walgreens' financial condition and results of operations, and to correct promptly any public statements issued by Walgreens which had become materially false or misleading.

102.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walgreens disseminated in the marketplace during the Class Period concerning Walgreens' results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walgreens to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Walgreens within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Walgreens common stock.

103.    Each of the Individual Defendants, therefore, acted as a controlling person of Walgreens.  By reason of their senior management positions and/or being directors of Walgreens, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Walgreens to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Walgreens and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

104.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Walgreens.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 30, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Joshua B. Silverman
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859
Fax: (312)-377-1184
jbsilverman@pomlaw.com

*Attorneys for Plaintiff*