**POMERANTZ LLP**
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Lead Plaintiff Victoriano Toyos and*
*Lead Counsel for the Class*

*Additional Counsel on Signature Page*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEVE KLEIN, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:25-cv-01058 |
| Plaintiff, | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA, ROSALIND G. BREWER, GINGER GRAHAM, TIMOTHY C. WENTWORTH, JAMES KEHOE, and MANMOHAN MAHAJAN, | **DEMAND FOR JURY TRIAL** |
| Defendants. | Hon. Joan H. Lefkow |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 2

II.    JURISDICTION AND VENUE ......................................................................... 5

III.   PARTIES ............................................................................................................ 6

     A.    Lead Plaintiff ........................................................................................... 6

     B.    Additional Plaintiff ................................................................................. 6

     C.    Defendants ............................................................................................... 6

         1.    Corporate Defendant ................................................................... 6

         2.    Individual Defendants ................................................................. 6

IV.   WALGREENS COMPANY BACKGROUND .................................................... 7

     A.    Walgreens' Business and Focus on Opioids ........................................... 7

     B.    Walgreens Must Comply With Federal Healthcare Laws ...................... 8

V.    WALGREENS' LONG HISTORY OF FACING LIABILITY FOR IMPROPER DISPENSING OF OPIOIDS AND FALSELY PROMISING TO CHANGE ................. 8

     A.    2013 DEA Settlement .............................................................................. 8

     B.    2019 Walgreens Shareholder Resolution and Oversight Report ......................... 14

     C.    2022 State of Florida Settlement ............................................................ 16

     D.    2022 California Finding of Liability ........................................................ 18

     E.    2022 Ohio Finding of Liability .............................................................. 20

     F.    2022 Multi-State Settlement ................................................................... 22

VI.   WALGREENS FACILITATED IMPROPER DISPENSING OF OPIOIDS BEFORE AND DURING THE CLASS PERIOD ........................................................... 23

     A.    Walgreens Did Not Enforce Its Good Faith Dispensing Policy or Any Other Policy To Prevent Improper Dispensing of Opioids ........................................... 23

         1.    Walgreens Had a Good Faith Dispensing Policy that Was Never Effectively Implemented ........................................................... 23

         2.    Walgreens Pharmacists Did Not Comply with Walgreens GFD Policy or

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

Complete TDFGD Checklists ................................................................. 25

B.  Walgreens Did Not Give Pharmacists Sufficient Time to Evaluate Whether to Refuse Filling Prescriptions .................................................................... 29

C.  Walgreens Pressured Pharmacists To Fill as Many Prescriptions as Possible .... 31

   1.  Walgreens Incentivized Pharmacists To Fill Prescriptions .................... 31

   2.  Walgreens Retaliated Against Pharmacists Who Refused To Fill Suspicious Prescriptions ......................................................................... 32

D.  Walgreens Did Not Employ Technology To Prevent Improper Dispensing of Opioids ..................................................................................................... 34

   1.  Walgreens Had No Formal Technological System in Place to Prevent Improper Dispensing of Opioids ............................................................. 34

   2.  RxIntegrity Prohibited Pharmacies from Using IntercomPlus Prescriber Profiles To Warn of "Candy Docs" ........................................................ 37

E.  Walgreens Violated the CSA and FCA ..................................................... 37

VII.  DEFENDANTS MISLED INVESTORS TO BELIEVE THAT WALGREENS WAS TAKING ACTIONS TO PREVENT IMPORPER DISPENSING OF OPIOIDS THAT IT WAS NOT TAKING ............................................................................................... 40

A.  Defendants Misled Investors to Believe that Walgreens "Supports Pharmacists' Right To Refuse To Fill" Opioid Prescriptions and Did Not "Support[] Pharmacists in Upholding the Oath of a Pharmacist" .......................................... 40

B.  Defendants Misled Investors To Believe that Walgreens "Maintain[ed] a Good Faith Dispensing Policy" That It Followed ........................................................ 41

C.  Walgreens Misled Investors To Believe that It Used "Technology To Help Pharmacists Ensure That They Were Dispensing [Legitimate] Prescriptions" ... 42

D.  Defendants Falsely Assured Investors That Walgreens Complied with Applicable Laws and Regulations Concerning Dispensing Medication and Submitting Claims to the Government ......................................................................................... 43

E.  A Series of Disclosures Revealed That Walgreens Had Misled Investors, and Investors Suffered Losses ............................................................................... 43

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................................. 44

A.  Defendants' False and Misleading Statements in 2020 ...................................... 44

   1.  October 15, 2020 ................................................................................... 44

B. Defendants' False and Misleading Statements in 2021 ...................................... 45

    1. April 23, 2021 ............................................................................. 45

    2. October 14, 2021 ......................................................................... 46

C. Defendants' False and Misleading Statements in 2022 ...................................... 47

    1. February 22, 2022 ....................................................................... 47

    2. May 5, 2022 ................................................................................ 48

    3. October 13, 2022 ......................................................................... 48

    4. October 27, 2022 ......................................................................... 49

    5. November 2, 2022 ....................................................................... 50

D. Defendants' False and Misleading Statements in 2023 ...................................... 50

    1. March 10, 2023 ........................................................................... 50

    2. October 12, 2023 ......................................................................... 51

E. Defendants' False and Misleading Statements in 2024 ...................................... 52

    1. January 26, 2024 ......................................................................... 52

    2. October 15, 2024 ......................................................................... 53

IX. LOSS CAUSATION .................................................................................................. 54

A. January 5, 2023 ................................................................................................... 54

B. June 27, 2023 ...................................................................................................... 55

C. January 17, 2025 ................................................................................................. 56

D. January 27, 2025 ................................................................................................. 58

E. February 11, 2025 ............................................................................................... 60

F. February 28, 2025 ............................................................................................... 61

X. ADDITIONAL SCIENTER ALLEGATIONS ........................................................... 62

A. Defendants Received Regular Reports on Opioid Dispensing Practices During the Class Period ........................................................................................................ 62

B. Board Report on Oversight of Risk Related to Opioids States Defendants Were

Responsible for Managing Risks Related to Opioids ........................................... 63

C. Walgreens' CIA Required Tracking and Reporting on Compliance Concerning Opioids to the Board ............................................................................ 64

D. ESG Report States Defendants Were Required to Know and Implement Policies ............................................................................................................. 65

E. Defendants Knew that Walgreens Was Failing To Comply with Healthcare Laws, and So Was Under an Obligation To Investigate Whether the Company Had Achieved Compliance Before Claiming As Much to Investors ......................... 66

F. Defendants Had Motive To Commit Fraud from Massive Stock Sales .............. 67

G. Pharmaceutical Sales Were the Core Operation of Walgreens ........................... 69

XI. CLASS ACTION ALLEGATIONS ................................................................. 69

XII. COUNT ONE .................................................................................................. 72

XIII. COUNT TWO ................................................................................................. 74

XIV. PRAYER FOR RELIEF ................................................................................. 76

XV. JURY DEMAND ............................................................................................. 76

Lead Plaintiff Victoriano Toyos ("Plaintiff" or "Lead Plaintiff"), and additional plaintiff Steve Klein ("Additional Plaintiff" and, together with Lead Plaintiff, "Plaintiffs") on behalf of a class of all persons and entities other than Defendants that purchased or otherwise acquired Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company") common stock between October 15, 2020 and February 27, 2025, both dates inclusive (the "Class Period"), and were damaged as a result,[1] bring this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its former and current top officials—Chief Executive Officer ("CEO") Stefano Pessina, CEO Rosalind G. Brewer, Interim CEO Ginger Graham, CEO Timothy C. Wentworth, Chief Financial Officer ("CFO") James Kehoe, and CFO Manmohan Mahajan (collectively, "Individual Defendants," and together with Walgreens, "Defendants").

Plaintiffs' claims are based on personal knowledge as to their own acts, and on information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Walgreens with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Walgreens and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Walgreens, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys and their agents, including interviews with former Walgreens employees; (5) facts uncovered by the DOJ in its investigation of Walgreens ("DOJ Investigation") and made public in the DOJ's April 18, 2025 complaint against Walgreens; and (6) other publicly available information concerning Walgreens, its business, and the allegations in this Complaint. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations in this Complaint.

---

[1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

## I.       INTRODUCTION

1.       This is a federal securities class action (the "Action") on behalf of a class of all persons and entities other than Defendants that purchased or otherwise acquired the securities of Walgreens between October 15, 2020 and February 27, 2025, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.       Walgreens operates as a healthcare, pharmacy, and retail company in the U.S., the United Kingdom, Germany, and internationally.  The lion's share of sales for the U.S. Retail Pharmacy segment is derived from the sale of prescription drugs, the majority of which are reimbursed by third-party payors, including federal healthcare programs.

3.       Over the last two decades, overprescription, overuse and abuse of opioids has developed into a nationwide public health crisis that has ravaged communities across the U.S.  In 2017, the opioid crisis was declared a public health emergency under section 319 of the Public Health Service Act, and that declaration was renewed most recently in June 2024.  According to the Centers for Disease Control and Prevention, more than 645,000 people in the U.S. have died from overdoses involving opioids since the epidemic began, and non-fatal opioid overdoses have placed significant burdens on governments, health systems, and families.

4.       In response to this crisis, Walgreens has described itself as "a leader in providing education and resources, as well as implementing best-in-class policies and procedures, to help combat opioid misuse and abuse."  Moreover, as part of its ostensible commitment to Environmental, Social and Governance ("ESG") progress, the Company has claimed to be "proud of its health-centered sustainability strategy that focuses on healthy communities, a healthy planet, a healthy and inclusive workplace and a sustainable marketplace."

5.       In fact, the opposite is true—for more than a decade, Walgreens has systematically facilitated the opioid crisis, faced liability, falsely promised to change to appease regulators and shareholders, and then continued about its business of profiting wrongfully from this historic

epidemic. In 2013, Walgreens reached a settlement (the "2013 Agreement") with U.S. Department of Justice ("DOJ") and the U.S. Drug Enforcement Administration in which the Company acknowledged its failure to comply with the CSA when Walgreens failed to prevent the diversion—*i.e.* the transfer of any legally prescribed controlled substance from the individual for whom it was prescribed to another person for any illicit use—of certain opioids for abuse and illegal black market sales. Similarly, in May 2022, Walgreens announced that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state. Just months later, in November 2022, the Company announced that it had agreed in principle to a multi-state opioid settlement framework to resolve claims that Walgreens mishandled prescriptions of opioid painkillers, pursuant to which Walgreens would make up to approximately $4.95 billion in remediation payments to be paid out over 15 years. In April 2024, the City of Philadelphia announced that it had reached a settlement agreement in its 2021 lawsuit against Walgreens for the Company's role in supplying and perpetuating the opioid addiction crisis in Philadelphia, pursuant to which Walgreens would pay the city $110 million in compensation over five years. As recently as September 2024, Walgreens reached a settlement with the City of Baltimore to resolve claims against the Company for its role in fueling the opioid epidemic in Baltimore, pursuant to which Walgreens agreed to pay the city $80 million.

6.      Throughout the Class Period, Defendants made concrete promises to the public that Walgreens was taking specific actions to confront the Opioid epidemic and comply with applicable laws, but these promises were flatly misleading.

7.      *First*, Walgreens promised that it "support[ed its] pharmacists right to refuse to fill" opioid prescriptions. In fact, Walgreens undermined its pharmacists right to refuse to fill opioid prescriptions because Walgreens systematically gave pharmacists insufficient time to evaluate whether prescriptions were proper, penalized pharmacists who failed to comply, and pressured pharmacists to fill as many prescriptions as possible in order to keep their jobs or to achieve bonuses or promotions.

8. *Second*, Defendants promised that Walgreens "maintain[ed] a good faith dispensing policy" that it detailed to investors. But that promise was at best half true, as Walgreens did not enforce such a policy, and the policy widely was not followed, before or during the Class Period.

9. *Third*, Defendants promised that Walgreens used "technology to help pharmacists ensure that they were dispensing [legitimate] prescriptions." Yet Walgreens deployed no such technology, and Walgreens even prevented pharmacists from using Walgreens computers to track suspicious and problematic prescribers. Indeed, Walgreens failed to provide any of the technology provided to pharmacists at peer pharmacies such as Wal-Mart and CVS.

10. *Finally*, Defendants repeatedly promised that Walgreens complied with healthcare laws when it stated, for example: "We comply with applicable pharmacy and healthcare laws," "We adhere to laws relating to government . . . programs," and "[w]e appropriately submit claims and bill government programs." In connection with its sale of prescription drugs, Walgreens must comply with the Controlled Substances Act ("CSA"). Under the CSA, controlled substances may be dispensed only pursuant to prescriptions that are effective—*i.e.*, "for a legitimate medical purpose" and issued "by an individual practitioner acting in the usual course of his professional practice." When seeking reimbursement for these drugs from federal healthcare programs, Walgreens must submit claims that comply with the False Claims Act ("FCA"), which prohibits Walgreens from knowingly submitting fraudulent claims to the government for payment or approval. In fact, contrary to its repeated promises, Walgreens rampantly violated both the CSA and the FCA throughout the Class Period by dispensing opioids under prescriptions that were invalid and by submitting numerous false claims for reimbursement for dispensing invalid opioid prescriptions.

11. The truth that Walgreens had again been misleading the public about its responses to the opioid crisis was partly revealed, and the risks Walgreens concealed with its misleading statements materialized, over a series of disclosures. On January 5, 2023, Walgreens reported that "a huge opioid settlement dragged Walgreens to a $3.7 billion loss in its fiscal first quarter." On June 27, 2023, the Tenth District Court of Appeals ruled that opioid overdoses could be traced to

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

Walgreens' failure to flag the large number of pills prescribed to individuals filling prescriptions. Then on January 17, 2025, the DOJ announced the filing of a civil complaint (the "DOJ Complaint") alleging that Walgreens "dispensed millions of unlawful prescriptions in violation of the Controlled Substances Act (CSA) and then sought reimbursement for many of these prescriptions from various federal health care programs in violation the False Claims Act (FCA)." Specifically, the DOJ's "complaint alleges that, from approximately August 2012 through the present, Walgreens knowingly filled millions of prescriptions for controlled substances that lacked a legitimate medical purpose, were not valid, and/or were not issued in the usual course of professional practice," including "prescriptions for dangerous and excessive quantities of opioids, prescriptions for early refills of opioids and prescriptions for the especially dangerous and abused combination of drugs known as the 'trinity,' which is made up of an opioid, a benzodiazepine and a muscle relaxant." In the subsequent days and weeks, on January 27, 2025 and February 11 and 28, 2025, additional information about Walgreens' liability for opioids was revealed to the public.

12. Following these announcements, Walgreens' stock dropped precipitously. Plaintiffs sue to recover their losses from Walgreens' extensive fraud.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Walgreens is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Lead Plaintiff

17.     Plaintiff Victoriano Toyos, as set forth in the certification attached as Exhibit C to the Declaration of J. Alexander Hood II (ECF No. 23-3), incorporated in this Complaint by reference, acquired Walgreens securities at artificially inflated prices during the Class Period and suffered damages as a result.

### B.     Additional Plaintiff

18.     Additional Plaintiff Steve Klein, as set forth in the certification attached to the original Complaint (ECF No. 1-1), incorporated in this Complaint by reference, acquired Walgreens securities at artificially inflated prices during the Class Period and suffered damages as a result.

### C.     Defendants

#### 1.     Corporate Defendant

19.     Defendant Walgreens is incorporated in Delaware, and its principal executive offices are located at 108 Wilmot Road, Deerfield, Illinois 60015.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBA."

#### 2.     Individual Defendants

20.     Defendant Stefano Pessina ("Pessina") served as Walgreens' Chief Executive Officer ("CEO") from prior to the start of the Class Period until March 2021.

21.     Defendant Rosalind G. Brewer ("Brewer") served as Walgreens' CEO from March 2021 until September 2023.

22.     Defendant Ginger Graham ("Graham") served as Walgreens' Interim CEO from September 2023 until October 2023.

23.     Defendant Timothy C. Wentworth ("Wentworth") has served as Walgreens' CEO since October 2023.

24.     Defendant James Kehoe ("Kehoe") served as Walgreens' Chief Financial Officer ("CFO") from prior to the start of the Class Period until July 2023.

25.     Defendant Manmohan Mahajan ("Mahajan") has served as Walgreens' CFO since July 2023.

26.     Defendants Pessina, Brewer, Graham, Wentworth, Kehoe, and Mahajan are collectively referred to in this Complaint as the "Individual Defendants."

27.     Defendant Walgreens and the Individual Defendants are collectively referred to in this Complaint as "Defendants."

## IV.     WALGREENS COMPANY BACKGROUND

### A.     Walgreens' Business and Focus on Opioids

28.     Walgreens operates as a healthcare, pharmacy, and retail company in the U.S., the United Kingdom, Germany, and internationally.  The Company's operations are conducted through three reportable segments: U.S. Retail Pharmacy, International, and U.S. Healthcare.  The U.S. Retail Pharmacy segment includes the Walgreens business, which includes, among other things, the operations of retail drugstores, health and wellness services, and specialty and home delivery pharmacy services.  A significant percentage of sales for the U.S. Retail Pharmacy segment is derived from the sale of prescription drugs, the majority of which are reimbursed by third-party payors, including federal healthcare programs.

### B. Walgreens Must Comply With Federal Healthcare Laws

29.     In connection with its sale of prescription drugs, Walgreens must comply with various federal statutes, including the CSA, 21 U.S.C. §§ 801-904, which was enacted by Congress to prevent the diversion of controlled substances.  Under the CSA, all registrants, including pharmacies, are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances" and controlled substances may be dispensed only pursuant to prescriptions that are effective—*i.e.*, "for a legitimate medical purpose" and issued "by an individual practitioner acting in the usual course of his professional practice."  *See* 21 C.F.R. § 1306.04(a).  Further, when seeking reimbursement for these drugs from federal healthcare programs, Walgreens must submit accurate claims to avoid incurring penalties under the FCA, 31 U.S.C. §§ 3729-33, the federal government's primary tool in combating fraud against the government.  Specifically, the FCA provides that anyone who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the U.S. for damages.  31 U.S.C. § 3279(a)(1)(A)-(B).

## V.     WALGREENS' LONG HISTORY OF FACING LIABILITY FOR IMPROPER DISPENSING OF OPIOIDS AND FALSELY PROMISING TO CHANGE

30.     As shown through the DOJ Investigation and public records, Walgreens has a long history of facilitating the improper dispensing of opioids, which has led to significant liability and—ultimately meaningless—promises of change.

### A.     2013 DEA Settlement

31.     In April 2011, after an extensive investigation that showed wrongdoing, Walgreens entered an administrative memorandum of agreement to settle with the DEA, which was announced on June 11, 2013 (the "DEA Settlement").  According to the DEA Settlement, Walgreens agreed to pay an $80 million fine and to implement controls to prevent controlled substances, including oxycodone and other prescription painkillers, to be diverted into the black market.

32.     In response to the opioid epidemic, enforcement agencies at federal, state, and local levels began investigating and working to shut down "pill-mills" and prevent prescription drugs' diversion onto the black market.  In 2010, Florida passed legislation in an attempt to prevent the diversion of prescription drugs such as oxycodone for recreational use.  Due to this legislation, Florida pain clinics were no longer authorized to dispense C-II drugs.  To fill their prescriptions, customers seeking these drugs turned instead to pharmacies such as Walgreens, which was a primary option for Florida opioid dispensing, with 850 Walgreens pharmacies.

33.     Walgreens oxycodone sales in Florida subsequently exploded.  In 2010, of the top 100 purchases of oxycodone in Florida, only three were Walgreens retail pharmacies.  This number grew to thirty-eight in 2011, and forty-four in 2012.  Walgreens' distribution center in Jupiter, Florida supplied all of these retail pharmacies.  The Jupiter center provides prescription drugs, including oxycodone to Walgreens pharmacies in both Florida and its surrounding states. Walgreens' Florida locations began purchasing exceedingly large quantities of oxycodone by late 2010 through mid-2011.  Walgreens' expanding sales raised such red flags that it caused the DEA to investigate.

34.     In 2012, the DEA began a six-month investigation into practices of the Jupiter Center and Walgreens' retail pharmacies in Florida.  On September 13, 2012, the DEA found that the Jupiter Center's continued distribution of controlled substances posed an "imminent danger to the public health and safety."  Along with this finding, the DEA issued an Immediate Suspension Order ("ISO") and Order to Show Cause ("OTSC") as to why its DEA registration should not be revoked.  The DEA alleged, supported by numerous witnesses and exhibits, that Walgreens had violated the CSA, committing an "unprecedented number of record-keeping and dispensing violations."  The DEA concluded that Walgreens' pharmacists and senior management, had shown a "staggering disregard" for Walgreens' obligations under the CSA.  The DEA further ordered additional OTSCs against Walgreens' top six Florida oxycodone selling pharmacies between November 26, 2012, and February 9, 2013.

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

35.     Walgreens entered a settlement with the DEA executed in April 2011 and announced on June 11, 2013, resulting in the largest fine ever imposed against a pharmacy. Walgreens was penalized $80 million for its flagrant violations of its duties related to the prevention of diversion and abuse.   To resolve these violations and outstanding allegations involving the Jupiter Center and retail pharmacies in other states, Walgreens and the DEA entered into a Memorandum of Agreement ("MOA").   Walgreens agreed to pay civil penalties of $80 million in order to resolve claims that Walgreens negligently allowed the diversion of controlled substances into the black market.

36.     As part of the DEA Settlement, Walgreens agreed to maintain a compliance program to detect and prevent the diversion of controlled substances, including by regularly training Walgreens pharmacy employees on their responsibilities under the CSA and by implementing "procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills."

37.     Walgreens' purported efforts to cooperate with the DEA were repeatedly shown to be insincere.   After the DEA had began its 2012 regulatory investigation in Florida, Walgreens presented to the DEA on its "Controlled Substance Anti-Diversion and Compliance Program" in a purported effort to "cooperate and avoid litigation," and represented that it was making "new changes" to "enhance" its program.[2]   However, Walgreens internally admitted that, rather than enhancing its compliance program, enhancements were only made "in an effort to convince DEA that the proposed penalty is excessive . . . ."[3]

38.     On August 19, 2011, high level DEA investigators and management met with Walgreens personnel to advise them of DEA-generated information about Walgreens' oxycodone sales in Florida.   According to DEA documentation, as part of its "Focus on Compliance," after this meeting, Walgreens sought to appear to be developing "Oxycodone Action Plans" in certain

---

[2] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Memorandum in Opposition to Defendants Walgreens' Motion for Summary Judgment, Exhibit 18 (Dkt. 2205-18), at WAGMDL00659802.

[3] *Id.* at Exhibit 27 (Dkt. 2205-27), at WAGMDL00659270.

districts of Florida in order to reduce the volume of oxycodone dispensed in Walgreens pharmacies. As an example, at a Hudson, Florida pharmacy, the plan included "contacting the Jupiter warehouse and designating order limits for Oxycodone." Effective immediately, the plan purported to "limit" the Hudson store to orders of no more than 100 bottles of 100 count 30 mg oxycodone. However, the DEA later found, contrary to the plan, that the Jupiter Center shipped the multiple orders well of well over 100 bottles in the following months. Based on this data as an example, the DEA found that Walgreens' "inability to enforce a very simple, modest limitation on this one pharmacy is further evidence of its failure to maintain effective controls against diversion, even in the rare instance when it tried to do so."

39.     The DEA's investigation initially focused on Walgreens' Jupiter Center, as it was responsible for substantial opioid abuse in Florida. The DEA concluded that Walgreens' corporate headquarters had pushed for an increase in the number of oxycodone sales by providing pharmacy employees with bonuses linked to the number of prescriptions filled at the pharmacy. Walgreens ranked its Florida pharmacies by oxycodone prescriptions dispensed in June of 2010, and found that the highest-ranking store by oxycodone sales sold almost 18 prescriptions of oxycodone per day.

40.     This conduct in the DEA Settlement was not exclusive to Florida. The DEA Settlement also resolved similar investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, and investigations pursuant to the CSA by DEA field offices nationwide. In the Eastern District of New York, Walgreens allegedly violated the CSA by filling numerous prescriptions that Walgreens employees knew, or should have known, were not issued for a legitimate medical purpose. For example, according to the Department of Justice, from July 2010 until July 2012, a nurse practitioner, Eva MacDowall, wrote 94 different, illegitimate prescriptions—primarily for oxycodone and hydrocodone—filled at three Walgreens pharmacies in New York.

41.     Walgreens also admitted wrongdoing at its Colorado pharmacies. The DEA investigation in Colorado uncovered evidence that Walgreens pharmacies were filling fraudulent

prescriptions, filling prescriptions that were written by a physician with an expired DEA registration, filling prescriptions that lacked an address and/or DEA registration number, in violation of DEA regulations, and dispensing controlled substances to customers who did not have a prescription. The investigation also uncovered numerous instances of inaccurate and/or incomplete recordkeeping for controlled substances at Walgreens pharmacies throughout Colorado.

42.     Walgreens admitted as part of the MOA that its "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007, and December 27, 2007."[4]

43.     Walgreens also acknowledged in the DEA Settlement that some of its pharmacies dispensed "controlled substances in a manner not fully consistent with its compliance obligations under the CSA [and] its implementing regulations," and agreed to implement or maintain a variety of compliance measures moving forward.

44.     The terms of the MOA required Walgreens to, among other things, maintain a compliance program to detect and prevent the diversion of controlled substances and to provide training to its pharmacists to ensure compliance with the CSA and its implementing regulations.

45.     Similarly, Walgreens was required by the MOA to "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized ultimate users pursuant to federal and state law and regulations."

46.     Walgreens also agreed to "direct and train its pharmacists that their corresponding responsibility under federal law requires them not to fill a prescription that such pharmacist knows or has reason to know was issued for other than a legitimate medical purpose or by a practitioner acting outside the usual course of professional practice."

---

[4] *See In Re: National Prescription Opiate Litigation*, (Case No. 17-md-2804), Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Proof of Causation, Exhibit 117 (Dkt. 2426-2), WAGMDL00490963.

47.    Additionally, an "Addendum: Prospective Compliance" that was attached to the MOA required Walgreens to maintain a "Department of Pharmaceutical Integrity" that would coordinate compliance efforts involving controlled substances.  The Addendum further included a promise by Walgreens to train pharmacy personnel on the "red flags" of diversion and annually on its "Good Faith Dispensing Policy" related to "changing diversion threats of which Walgreens is aware."

48.    Walgreens formed the Pharmaceutical Integrity ("RX Integrity") group in 2012 as a result of the DEA investigation, purportedly to direct compliance efforts at Walgreens.  When the RX Integrity group was created, Walgreens stated that the purpose of it was to "play a greater role in the Opioid Narcotic Epidemic . . . [by] ensuring safety, compliance, and security of the ordering and dispensing of controlled substances."[5]  Yet the group internally viewed its role as protecting against the loss of DEA licenses from the Distribution Centers and pharmacies.[6]

49.    Walgreens' compliance efforts were for show in most cases.  Walgreens had no real intention of following through on the promised compliance initiatives it made, and Walgreens further never intended that RX Integrity would work beyond superficially limiting opioid dispensing, nor did it provide the RX Integrity unit with necessary resources to perform adequately for Walgreens' over 9,000 pharmacies.  Although the RX Integrity department was charged with monitoring its distribution centers and massive network of over 9,000 pharmacies, the department primarily consisted of fewer than 5 people, and at its height, only had eleven members.[7]

50.    Even after acknowledging its failure to comply with the CSA and promising significant changes to ensure compliance as part of its settlement with the DEA, Walgreens continued its facilitation of improper dispensing of opioids for years to come.

---

[5] *Id*. at Exhibit 48 (Dkt. 2205-48), WAGMDL00303029.

[6] *Id*. at Exhibit 29 (Dkt. 2205-29), WAGMDL00101723.; *See also* Exhibit 30 (Dkt. 2205-30), WAGMDL00060486.

[7] *Id*. at Exhibit 29 (Dkt. 2205) at 7.

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

B.      **2019 Walgreens Shareholder Resolution and Oversight Report**

51.     As the opioid epidemic continued, eight years later, Walgreens' shareholders voted in January 2019 to make the Company prepare a report that would explain what steps the Walgreens' Board of Directors ("Board") was taking in order to monitor and manage the opioid crisis.  Although it was opposed by the Board, as outlined in Walgreens' December 16, 2018 Proxy Statement (the "2018 Proxy"), the resolution that was approved by the shareholders required Walgreens to explain what "governance measures Walgreens has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis in the U.S."

52.     This resulted in the June 2019 Board Report on Oversight of Risk Related to Opioids (the "2019 Oversight Report"), which was detailed in the Company's December 10, 2019 Proxy Statement (the "2019 Proxy").  The Board stated in the 2019 Oversight Report:

> [Walgreens] cares deeply about the devastating impact of the opioid epidemic on our communities.  The core values of the Company are trust, care, innovation, partnership and dedication.  The Company and the Board work to ensure that the principles of honesty and integrity, which underpin trust, characterize every aspect of our business activity, and we are committed to transparency and engagement with all stakeholders, including our investors.

53.     The 2019 Oversight Report also highlighted the implementation of Walgreens' "Good Faith Dispensing" ("GFD") policy, which purportedly empowered Walgreen pharmacists to refuse to fill prescriptions if a prescription for a controlled substance could not be properly verified, in their professional judgment.

54.     The 2019 Oversight Report describes in detail the role in monitoring regulatory compliance that the Board is expected to play.  The 2019 Oversight Report acknowledges explicitly the Board's responsibility in mitigating risks about compliance and risks related to prescription opioids:

> As set forth in the Company's Corporate Governance Guidelines, the Board has responsibility for overseeing risk management policies and processes designed to promote ethical conduct and legal compliance and the Company's compliance with applicable laws and regulations.  As a whole and through its committees, the Board exercises oversight over the elements and dimensions of major risks that we face,

including risks related to prescription opioids.

55.     The 2019 Oversight Report also details the Audit Committee's role in ensuring

compliance related to prescription opioids:

> The Audit Committee, which consists solely of independent directors, has explicit
> oversight responsibility for enterprise risk assessment and risk management
> pursuant to its charter.  It also has explicit oversight of legal and compliance matters
> relevant to the Company, including legal and compliance matters related to
> prescription opioids.

***

> The Audit Committee receives and reviews quarterly reports from the Company's
> General Auditor (who has a direct reporting line to the Audit Committee) and
> Global Chief Compliance and Ethics Officer (who has a dotted reporting line to the
> Audit Committee) and also receives and reviews regular reports on risk
> management and the Company's ERM program and patient safety.  It has executive
> sessions with the Company's General Auditor and Global Chief Compliance and
> Ethics Officer at each regular meeting.  The Audit Committee and/or the Board
> receives and reviews a legal report, including on matters relating to prescription
> opioids, as applicable, from the Company's General Counsel and the General
> Counsel of the Company's Retail Pharmacy USA division on a regular basis.  The
> information facilitates a robust dialogue between senior leaders and the Audit
> Committee with respect to key areas of Audit Committee oversight.

56.     The Board's Nominating and Governance Committee also has responsibility

through its oversight of Walgreens' Corporate Social Responsibility function.  As stated in the

2019 Oversight Report:

> The Nominating and Governance Committee, which consists solely of independent
> directors, regularly reviews risks related to our governance structures and processes
> and Corporate Social Responsibility ("CSR") function, which includes the ways in
> which we are working to address the opioid epidemic in the United States. Pursuant
> to its charter, the Nominating and Governance Committee has oversight
> responsibility for CSR matters and receives and reviews reports on these matters at
> least annually. It also has oversight responsibility for the Company's Code of
> Conduct and Business Ethics (the "Code of Conduct") which, among other things,
> states that employees are expected to comply with all Company policies, as well as
> the laws and regulations in the locations where we do business.

57.     The 2019 Oversight Report failed to recognize not only that Walgreens was

woefully deficient in ensuring that the GFD policy was being implemented, but that it was also

actively working against efforts to allow pharmacists the necessary autonomy to perform their

legal duties properly.  As explained below, through its policies, Walgreens has insisted that its

pharmacists throughout the United States regularly dispense opioids without doing necessary (and

required) due diligence. Moreover, as detailed by numerous pharmacists throughout the U.S., Walgreens' purported support of its pharmacists' right to refuse to fill controlled substances prescriptions was belied by its management, who insisted pharmacists fill these suspect prescriptions or be fired.

### C.     2022 State of Florida Settlement

58.     The DEA's extensive investigation into Walgreens' distribution practices led to the DEA Settlement. Despite Walgreens' promises through the DEA Settlement to enact and maintain a compliance program to detect and prevent diversion and abuse of controlled substances as required under the CSA and other DEA regulations, which included procedures to identify the common signs associated with the diversion and abuse of controlled substances at all its retail pharmacies, and Walgreens' promises to implement and maintain policies and procedures to ensure that prescriptions for controlled substances were only dispensed to authorized individuals pursuant to federal and state law and regulations, Walgreens continued to disregard and disobey the Agreement and allow the overprescription of opioids in concentrated areas such as Florida. Walgreens deliberately maintained anti-diversion measures in a manner structured to avoid reporting to the DEA, which is required under both the law and the DEA Settlement. The DEA characterized this behavior as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant."

59.     The State of Florida filed a suit against Walgreens for violations of laws relating to public nuisance, negligence, the Florida Deceptive and Unfair Trade Practices Act, civil conspiracy, and Florida RICO statutes (the "Florida Action").[8] The Florida Action alleged that Walgreens contributed to the opioid epidemic in Florida through the improper dispensing of large amounts of opioids, and that these actions resulted in thousands of Floridians' deaths and caused numerous more to suffer from addiction. The Florida Action alleged that Walgreens "repeatedly

---

[8] The Florida Action is captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma, L.P., et al.* (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County).

turned a blind eye to red flags and signs of diversion and abuse among their customers in Florida and around the country," "failed to put controls in place to identify suspicious pharmacies and ensure that the Distributors were not facilitating those pharmacies' unlawful diversion," and "behaved unreasonably by failing to notify any Florida law enforcement agency or regulatory body about suspicious orders or evidence of diversion." Along with other distributors, Walgreens was accused of the following conduct:

> The Distributor Defendants supplied opioids to pharmacies dispensing a high percentage of controlled substances, pharmacies that dispensed opioid cocktails (dangerous combinations of drugs such as opiates, benzodiazepine, and muscle relaxants), and pharmacies that did not have adequate controls in place to prevent diversion and abuse. The Distributor Defendants served pharmacies that filled prescriptions from far-off and out-of-state doctors and pain clinics, as well as pharmacies that supplied more than one opioid to a single patient – a pattern of prescribing that is unlikely to be medically justified and thus carries a high risk of diversion. The Distributors supplied opioids to pharmacies that admitted to servicing pill mills, high-prescribing doctors, and pharmacies that reported early refills, doctor shopping, and other suspicious practices indicative of abuse or diversion. The Distributor Defendants refused to shop shipments of opioids to such pharmacies.

> The Distributor Defendants increased supply of opioids, despite red flags, by approving incremental threshold increases, even where the requests raised the pharmacy's level of oxycodone to suspiciously high levels.

> ***

> As distributors that also operated many pharmacies, Walgreens and CVS were aware of red flags that should have caused their pharmacies to investigate a prescription before filling it. Examples of such red flags include doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area; early refills for opioids prescriptions, prescriptions with unusual quantities or dosages; patients seeking to fill a prescriptions written for someone else; multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who drive long distances to have a prescription filled; consumers who seek large volumes of controlled substances in the highest strength for each prescription type; patients who appear to be creating cocktails with muscle relaxants or tranquilizers, consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

> Walgreens and CVS filled opioid prescriptions in Florida under circumstances showing red flags for opioid diversion, in violation of their common law and statutory duties under Florida law.

> Walgreens and CVS failed to train or instruct their employees with respect to proper policies and protocols to follow to prevent diversion of opioids. This has the direct, readily foreseeable and intended result of employees continuing to fill prescriptions despite clear red flags.

60.     The Florida Action also alleges improper conduct specifically taken by Walgreens:

> Walgreens sold and shipped unreasonable quantities of opioids into Florida, including many red-flag pharmacies in Florida, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Florida. Walgreens further dispensed unreasonable quantities of opioids from its own retail pharmacies in Florida despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Florida law. Walgreens has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores, including in Florida, but continues to allow inappropriate and harmful distribution of opioids.

61.     The allegations in the Florida Action should have been properly addressed and handled by the Board through its strict compliance to the DEA Agreement, but they were not. Walgreens' continued failure led the State of Florida to sue Walgreens for additional violations of law relating to its opioid dispensing practices.

62.     On May 5, 2022, Walgreens issued a press release announcing that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state. On May 22, 2022, the Attorney General of Florida announced that the Company would pay $683 million to the state in order to end its litigation against the Company. The State Attorney General stated, "We now go into battle armed and ready to fight back hard against this manmade crisis . . . . The funds will undoubtedly save the lives of Floridians."

**D.     2022 California Finding of Liability**

63.     Walgreens has formally been found liable in federal court for its improper opioid dispensing practices in California, including for "dispens[ing] hundreds of thousands of red flag opioid prescriptions." The Honorable Charles R. Breyer of the U.S. District Court for the Northern District of California found Walgreens liable on August 10, 2022 in an action by the San Francisco City Attorney. Judge Breyer ruled that the Company had contributed to and was partly liable for San Francisco's opioid epidemic (the "California Action").[9]

---

[9] *City and County of San Francisco et al., v. Purdue Pharma, L.P., et al.* (Case No. 18-cv-07591-CRB) (N.D. CA).)

64. San Francisco has been battling an opioid epidemic, with high rates of opioid abuse and addiction. Walgreens is San Francisco's largest dispenser of opioids.

65. Judge Breyer found that during a bench trial in April 2022, the City of San Francisco offered sufficient evidence in order to show that Walgreens was involved in unreasonable conduct, which was a leading factor in San Francisco's opioid epidemic. Notably, the Court found that "Walgreens did not provide its pharmacists with sufficient time" to fill opioid prescriptions, and that pharmacists "experienced constant pressure to fill prescriptions as quickly as possible." As Judge Breyer ruled:

> The evidence at trial established that from 2006 to 2020, Walgreens pharmacies in San Francisco dispensed hundreds of thousands of red flag opioid prescriptions without performing adequate due diligence. Tens of thousands of these prescriptions were written by doctors with suspect prescribing patterns. **The evidence showed that Walgreens did not provide its pharmacists with sufficient time, staffing, or resources to perform due diligence on these prescriptions. Pharmacists experienced constant pressure to fill prescriptions as quickly as possible, and a shortage of resources to review them before dispensing.** As a result of Walgreens' fifteen-year failure to perform adequate due diligence, Plaintiff proved that it is more likely than not that Walgreens pharmacies dispensed large volumes of medically illegitimate opioid prescriptions that were diverted for illicit use and that substantially contributed to the opioid epidemic in San Francisco.

66. Over the 15 years at issue, the Company dispensed over 6 million opioid pills as a result of prescriptions written by only 31 pharmacists in San Francisco.

67. As Judge Breyer ruled:

> As a result of Walgreens' fifteen-year failure to perform adequate due diligence, it was proven that Walgreens pharmacies dispensed large volumes of medically illegitimate opioid prescriptions that were diverted for illicit use and that substantially contributed to the opioid epidemic in San Francisco. The evidence presented at trial demonstrated why Walgreens pharmacies failed to perform due diligence before dispensing prescriptions. Walgreens pharmacists repeatedly requested additional staffing to help mitigate these challenges, but Walgreens did not provide it. The evidence showed that Walgreens pharmacies were chronically understaffed. The inadequate resources made it more challenging for pharmacists to perform their duties. Walgreens required its pharmacists to complete paper due diligence checklists and store them in file cabinets. Its pharmacists had no effective way to share concerns about suspicious prescribers. Their comments regarding suspicious prescribing practices were deleted, and they had to resort to keeping "sticky notes" posted in the pharmacy to track prescribers they considered to be suspicious. In this environment, pharmacists "had to cut corners because there was no time."

19

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

E.    **2022 Ohio Finding of Liability**

68.    On August 17, 2022, Walgreens was once again held formally liable in federal court by Judge Dan Polster of the U.S. District Court for the Northern District of Ohio, who ordered Walgreens and other pharmacies to pay $650 million over 15 years to two Ohio counties after they were found liable by a jury for contributing to the opioid epidemic.

69.    The jury in the underlying case concluded that Walgreens knowingly engaged in unlawful conduct by failing to take adequate measures to avoid diversion of prescription opioids. In denying a 50(b) motion for judgement as a matter of law after the jury finding, Judge Polster found the "Plaintiffs introduced evidence sufficient to show that Walgreens engaged in unlawful conduct by failing to take adequate measures to avoid diversion of prescription opioids."[10]

> In particular, Plaintiffs presented evidence of Defendants' dispensing of large quantities of highly addictive drugs in the Counties, while repeatedly failing to take legally-required, effective measures to identify and resolve "red flags" prior to dispensing, and failing to document any due diligence with respect to those red flags.

> \*\*\*

> Under the Court's instructions for unlawful conduct, the jury was required to find each Defendant's dispensing of controlled substances did not substantially comply with the Federal and Ohio Controlled Substances Acts and their accompanying regulations.

70.    Judge Polster specifically pointed to several forms of evidence that showed that Walgreens failed to implement effective controls against improper dispensing of opioids:

> The evidence showed that Walgreens had a poor record of compliance with its anti-diversion obligations. For example, a Walgreens document indicated that, as of 2010, retail employees received no periodic training for dispensing controlled substances. Moreover, Walgreens was aware of its obligation to ensure that its pharmacists documented the resolution of red-flag prescriptions. A 2018 document setting out Walgreens' policy on "Good Faith Dispensing" stated: "It is imperative that pharmacists document all efforts used to validate good faith dispensing." And Natasha Polster, Walgreens Divisional Vice President of Pharmacy Compliance Patient Safety, testified that, since at least 2012, it has been "an obligation of the pharmacist to document the resolution of red flags on prescriptions."

> Despite these explicit policies, however, the jury also heard evidence that Walgreens pharmacists regularly did not document the resolution of red flags, and that Walgreens was aware its pharmacists were not complying with the

---

[10] *In re: National Prescription Opioid Litigation*, 1:17-md-02804, Docket No. 4295.

requirements of its own Good Faith Dispensing policy. For example, pharmacist Amy Stossel testified on cross-examination that she regularly did not take the time to document her resolution of red flags. She stated that time constraints prevented her from doing so, noting there are never two pharmacists working a shift at her pharmacy at the same time. Similarly, Polster testified that, as of 2012, Walgreens had a bonus program that rewarded pharmacy staff based, in part, on the number of opioid prescriptions they dispensed. Specifically, this program provided financial incentives for pharmacists to fill more prescriptions than they had in the prior year, taking into account the total number of prescriptions filled, including prescriptions for controlled substances.

In addition, Plaintiffs introduced a memorandum of agreement that Walgreens entered into with the DEA in 2013, under which Walgreens agreed to significant enhancements in its controlled substances policies. A 2014 internal audit to investigate whether Walgreens pharmacies were adhering to these enhanced policies, however, revealed that 59 percent of its stores were not in compliance with relevant aspects of the Good Faith Dispensing Policy. The audit further found that some 35,000 Walgreens employees had not timely completed their Good Faith Dispensing training.

The jury also heard about other Walgreens policies that suggested its diversion control policies were inadequate. For example, in response to a juror's question, Stossel testified that, in cases where a pharmacist refused to fill a patient's prescription for opioids, Walgreens' policy was to return the prescription to the patient without scanning and entering it into the computer system. This would allow the customer to try his luck at another Walgreens store or return to the same store when another pharmacist is on duty.

Based on this evidence, the jury could reasonably have concluded Walgreens failed to implement effective controls against diversion.

71.     Additionally, Judge Polster noted an analysis that showed Walgreens documented red-flag prescriptions inadequately from 2006 to 2020:

The jury heard expert testimony from Dr. McCann and Catizone relating the findings of their analysis of red-flag prescriptions dispensed by Walgreens. Dr. McCann testified that, of the 806,193 opioid prescriptions that Walgreens dispensed in the Counties between 2006 and 2020, 175,609 prescriptions had at least one red flag that should have been resolved. . . . Catizone testified that, from his random sample of 2,000 red-flag opioid prescriptions dispensed by Walgreens, over 60 percent, or 1,237 prescriptions, had no relevant entries in any notes field. Of these, 940 prescriptions also had nothing written on the hard copy. Catizone told the jury that his physical inspection of the hard-copy prescriptions revealed that, even when he found written notes, they contained no significant documentation of due diligence. As noted above, Catizone concluded that, overall, 90 percent of the entire red-flag sample set lacked adequate documentation to show the pharmacist had identified and resolved the red flag before dispensing. Further, Dr. McCann testified this estimation could be extrapolated to the entire set of red-flag opioid prescriptions identified by Catizone, including approximately 90 percent of the 175,609 red-flag prescriptions dispensed by Walgreens.

Further, Plaintiffs adduced evidence that between 2006 and 2019, Walgreens' pharmacies dispensed a total of 25,346,069 dosage units of prescription opioids in

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

Lake County, and 27,969,541 dosage units in Trumbull County.

Again, having reviewed the evidence, the Court concludes the jury had a reasonable basis to find that Walgreens knowingly engaged in unlawful conduct by dispensing opioids without effective controls and procedures to guard against diversion.

### F.    2022 Multi-State Settlement

72.    On November 2, 2022, the Company issued a press release announcing that it had agreed in principle to a multi-state opioid settlement framework to resolve claims that Walgreens mishandled prescriptions of opioid painkillers, pursuant to which Walgreens would make up to approximately $4.95 billion in remediation payments to be paid out over 15 years. The press release stated that "[u]nder these frameworks, the company expects to settle all opioid claims against it by participating states, subdivisions and tribes, for up to approximately $4.95 billion in remediation payments to be paid out over 15 years."

73.    Walgreens' pervasive misconduct has resulted in even further liabilities. In April 2024, the City of Philadelphia announced that it had reached a settlement agreement in its 2021 lawsuit against Walgreens for the Company's role in supplying and perpetuating the opioid addiction crisis in Philadelphia, pursuant to which Walgreens would pay the city $110 million in compensation over five years. As recently as September 2024, Walgreens reached a settlement with the City of Baltimore to resolve claims against the Company for its role in fueling the opioid epidemic in Baltimore, pursuant to which Walgreens agreed to pay the city $80 million.

74.    For over a decade, Walgreens has engaged in fraudulent conduct that has resulted in investigations, lawsuits, and ultimately liability of billions of dollars. These are not mere allegations—Walgreens has twice been found liable in federal court pursuant to legal evidence for facilitating the improper dispensing of opioids. Although Walgreens has made numerous promises to change its practices in response to these findings, ultimately the Company continued throughout the Class Period to engage in the same conduct.

VI.     **WALGREENS FACILITATED IMPROPER DISPENSING OF OPIOIDS
        BEFORE AND DURING THE CLASS PERIOD**

A.      **Walgreens Did Not Enforce Its Good Faith Dispensing Policy or Any Other
        Policy To Prevent Improper Dispensing of Opioids**

        1.      **Walgreens Had a Good Faith Dispensing Policy that Was Never
                Effectively Implemented**

75.     Around 2012, Walgreens developed a "Good Faith Dispensing" (GFD) Policy,
purportedly to guide pharmacists in exercising their corresponding responsibility when filling
controlled substances. The GFD Policy purportedly guided pharmacists "to ensure that controlled
substance prescriptions are issued for a legitimate medical purpose by an individual practitioner in
the usual course of professional practice." The GFD Policy set out steps that pharmacists and
pharmacy technicians should complete to "validate" a controlled-substance prescription before
dispensing. For patients without an established relationship with the pharmacist, the GFD Policy
instructed pharmacists to ask for Government-issued identification and to document the identity
of the patient.

76.     The GFD Policy also instructed pharmacists to review the relevant PDMP
database—a state-level database into which pharmacists who fill a prescription are required to
report certain relevant information about the prescription—to confirm the appropriateness of each
controlled-substance prescription before filling the prescription.

77.     The GFD Policy also provided examples of situations "that should alert a
pharmacist to questionable circumstances." These included a pharmacist being presented with: a
"controlled-substance prescription written outside the usual course of the prescriber's . . . scope of
practice"; a prescription for unusually large dosages or quantities of controlled substances;
"frequent combination prescriptions for known drug 'cocktails' such as a benzodiazepine, opioid,
and carisoprodol"; a patient consistently requesting early controlled-substance prescription refills
or a prescriber consistently authorizing early prescription refills; or a patient paying for controlled
substances in cash. In such cases, the GFD Policy explained that pharmacists had a responsibility
to seek additional information from the patient or prescriber and instructed pharmacists to use their

professional judgment in evaluating whether to dispense such prescriptions. From 2012 on, Walgreens's GFD Policy specifically acknowledged that a prescription for an unusually high dosage of a controlled substance "should alert a pharmacist to questionable circumstances." Walgreens's pharmacist training materials on its GFD Policy further explained that prescriptions for large quantities of controlled substances "may be an indication that the prescription was not written for a legitimate medical purpose." The GFD Policy stated that it was "imperative" that pharmacists "document all efforts used to validate" prescriptions.

78.     According to FE1, in addition to the GFD Policy, Walgreens also instituted a "Target Drug Good Faith Dispensing" (TDGFD) Policy in 2013, which applied to all prescriptions for oxycodone, hydromorphone, and methadone single ingredient tablets and capsules ("Target Drugs"). FE1 was a pharmacist in West Virginia in 2014, a Pharmacy Manager in Crosslands, West Virginia from 2015 to 2019, a Staff Pharmacist in St. Albans, West Virginia from September 2021 to June 2022, and a Pharmacy Manager in Branchland, West Virginia from June 2022 to November 2022.

79.     According to FE1, the Target Drugs were opioids that Walgreens identified as presenting particularly high risks. FE1 explained that the TDGFD had an associated paper trail in the form of a checklist that pharmacists were supposed to use to document any instance of a refusal to fill a prescription.

80.     According to FE2, Walgreens' TDGFD checklist included things like checking a doctor's license, checking the ID of patients, checking for disciplinary actions against doctors, and verifying the prescription with the doctor's office. FE2 worked at Walgreens for nine years. FE2 was a Pharmacy Technician in North Arlington, N.J. from August 2012 to September 2014; a Pharmacy Intern from September 2014 to September 2018; a Pharmacist in Belleville, N.J. from September 2018 to March 2019; a Specialty Pharmacist in Hamilton, N.J. from March 2019 to August 2020; and a Pharmacy Manager from August 2020 to August 2021. FE2 reported to a Walgreens District Manager.

81.     The TDGFD Checklist provided that a pharmacist could not dispense a prescription for a Target Drug unless the pharmacist had:   reviewed the PDMP (if available); reviewed Walgreens's electronic profile for the patient and confirmed that no other Walgreens pharmacists had refused to fill the same prescription; and obtained a copy of a valid government photo ID for the patient.   The same TDGFD Checklist instructed pharmacists to check "yes" if the patient had previously received the same prescription from Walgreens; if the prescription was from the same prescriber as the previous fill; if the patient and/or prescriber address was close to the pharmacy; if the prescription was being filled on time (*i.e.*, the prescription was not being filled early); if the prescription was billed to third party insurance rather than paid for with cash; and if the patient did not appear intoxicated or under the influence of illicit drugs.   Further, in the case of chronic prescription use, pharmacists were instructed to check "yes" if such use was "explained and supported by documentation."

82.     If a pharmacist instead checked "no" for any of the above, the TDGFD Policy instructed that each such "no" was a red flag.   The same TDGFD Checklist provided a "Notes" section for a pharmacist to document any conversations with a prescriber's clinical staff.   At the bottom of the TDGFD Checklist, the pharmacist was required to mark whether she dispensed or refused the prescription and to sign the document.

### 2.     Walgreens Pharmacists Did Not Comply with Walgreens GFD Policy or Complete TDFGD Checklists

83.     Although on paper, Walgreens had a Good Faith Dispensing Policy, this policy was never enforced and was never widely implemented by Walgreens' pharmacists—the policy existed to satisfy regulators.   Numerous confidential witnesses confirm that Walgreens never did anything to enforce this policy, and in some instances overrode attempts by pharmacists to comply with it.

84.     According to FE3, Walgreens did nothing to enforce the GFD Policy.   FE3 worked at Walgreens from September 2007 to March 2022 in Florida.   FE3 was a Pharmacist from September 2007 to July 2009; and a Pharmacy Manager from May 2009 to March 2022. According to FE3, Walgreens "didn't have a supervisor who goes over the good faith dispensing

policy. They don't check to see if you filled out anything correctly or anything," FE3 said. "They don't enforce it." "[I]t's not like a block where if you didn't do it [a prescription] wouldn't be filled."

85.     FE1 confirmed that Walgreens did nothing to enforce its GFD Policy or the TGFDP checklist. Indeed, FE1 said that filling out the TGFDP checklist was such a cumbersome and time-consuming process that FE1 did FE1's best to avoid it altogether. "It was always such a big deal to report everything that it'd be easier to tell them you didn't have it or circumvent the process if we're being 100 percent honest." FE1 said. According to FE1, "no one ever checked to ensure it was being enforced." "Did anybody ever come back and talk to me about it? Ever? No," FE1 said. "I never had anything come back to me about it and never heard of any pharmacist who was questioned about it."

86.     FE1 had reason to believe pharmacists at other locations also were not filling out the checklist. "And I will also note the number of times I saw that happen from another location is slim to zero," FE1 said. In short, Walgreens had "a failed good faith dispensing" policy, in FE1's view.

87.     According to FE4, the GFD Policy was not enforced, and could not be, because it was effectively impossible to comply with it. FE4 worked for Walgreens from 2003 to 2019 as a Staff Pharmacist and Pharmacy Manager. FE4 at the Walgreens in Martinsburg, WV, before moving to the store in Charles Town, WV. FE4 reported to District Manager Thomas Barnett and later to Pharmacy Supervisor/Regional Healthcare Director Rusty Maney. According to FE4, Walgreens' GFD Policy was "just completely toothless" and "nonsensical." Walgreens was "actively pushing narcotics" (which generate a "profit margin" that is "so much higher" than other medications) while demanding that pharmacy staff follow unrealistic protocols. "It was completely unworkable," FE4 said, adding that "you'd be out of a job in no time" if you complied with all of the protocols because it was impossible to meet the demands of Walgreens' policies, including the GFD Policy. Following all the company's protocols would "bring workload to a

standing halt," FE4 said. FE4 believes that Walgreens implemented its GFD Policy to "placate the DEA" "while knowing it didn't effectively achieve anything."

88.     FE5 stated that Walgreens' Good Faith Dispensing Policy seemed to be more of a public relations tool as opposed to a strictly-enforced set of guidelines to make dispensing safer. worked for Walgreens from 2008 to 2016 as an Assistant Store Manager and Store Manager. FE5 was also trained as a Certified Pharmacy Technician and sometimes helped out in the pharmacy. FE5 worked at several stores in Middle Tennessee, including stores in Columbia, Franklin and downtown Nashville. FE5 stated that pharmacy staff did not take the guidelines seriously, and there did not seem to be consequences for not following the guidelines.

89.     FE2 agreed that the TDGFD was not mandatory. "There was not really a hard policy," FE2 said. "It was kind of at the discretion of the pharmacist."

90.     FE6 noted that Walgreens mangers sometimes would override pharmacists' attempts to comply with the GFD Policy. FE6 worked for Walgreens from January 2010 to June 2018 as a Senior Certified Pharmacy Technician, Pharmacy Intern and Pharmacy Manager and from February 2022 to February 2024 as a Pharmacy Manager. "[T]here were attempts" by district managers to get pharmacy staff to fill controlled substance prescriptions early. FE6 said that on a "few" occasions there was "some backdoor stuff" where Walgreens conducted a "customer service override" to try to "take care" of customers who complained about prescriptions not being filled. FE6 said there were a few instances when managers came into the pharmacy and asked staff to fill a controlled substance prescription that had not been filled.

91.     According to FE7, pharmacies were not penalized for failing to comply with dispensing policies. FE7 worked as a Manager of Compliance Monitoring Analytics for Walgreens from May 2020 to October 2021. Walgreens conducted "compliance walks" where supervisors walked through pharmacies to check for compliance related to various areas, including controlled substances. Individual pharmacies then received a scorecard based on their performance on the walks. But when pharmacies failed, "nothing ever changed," FE7 said.

92.     Indeed, according to the DOJ Investigation, back in 2015, Walgreens conducted an internal audit of 2,407 pharmacies to measure their compliance with the TDGFD Policy. RxIntegrity described the results of the audit as "unfavorable." It found that 40% of the pharmacies audited had not even taken the most basic steps of attaching completed TDGFD Checklists to filled Target Drug prescription copies, highlighting the fact that Walgreens pharmacists were not performing the due diligence necessary prior to dispensing drugs that Walgreens specifically identified as being particularly dangerous and commonly abused. Further, the audit found that even though the TDGFD Policy required Walgreens pharmacies to retain copies of all Target Drug prescriptions that pharmacists refused to fill, almost half of the pharmacies audited had failed to retain a single refused prescription for a Target Drug for 2015.

93.     Later, in 2019, RxIntegrity performed another survey of several hundred pharmacies, by asking supervisors to confirm whether their pharmacists completed TDGFD Checklists. The survey confirmed that Walgreens pharmacists were still not taking the most basic steps that the GFD and TDGFD Policies required. The survey responses included entries such as:

- "F[o]und multiple occasions where GFD form not included with targeted drug. RxM wasn't digging in to assess regularly."

- "The gfd binder was completely empty and it doesn't look like gfd is being managed properly at this location."

- "Store has not file[d] any of the document[s] in the [TDGFD] binder since 2013."

- "Required Rx's had no checklist attached and RxM acknowledged not using."

94.     A consulting firm retained by Walgreens in 2019 to analyze its pharmacy operations reported in a draft presentation to Walgreens: "We heard multiple reports of improper behavior" from pharmacists that was "largely attributed to the desire" to meet a Walgreens's metric known as "promise time," and "proper procedures are sometimes skirted or completely ignored due to worries of meeting promise time."

B.  **Walgreens Did Not Give Pharmacists Sufficient Time to Evaluate Whether to Refuse Filling Prescriptions**

95.     Walgreens required pharmacists to fill prescriptions within a set period of time, and those time limits were unrealistically short.  As a result, Walgreens's pharmacists had to skip proper procedures for validating prescriptions and so routinely filled invalid prescriptions.

96.     Numerous former employees have confirmed that Walgreens imposed unrealistic time limits for filling prescriptions that required pharmacists to ignore the GFD Policy and other due diligence that might otherwise ensure the proper dispensing of opioids.

97.     FE1 said that Walgreens imposed a time limit, called "Verify By Promise Time" ("VBPT"), of 15-minute to fill prescriptions for "waiters," customers who were waiting in the store to have a prescription filled.  FE1 stated that often FE1 was unable to meet the 15-minute rule because, among other reasons, Walgreens stores were usually understaffed.  Indeed, according to FE1, Walgreens did not give pharmacists nearly enough time to complete the elaborate TDGFD checklist for any opioid prescriptions.  "[I]t really became a burden to fill out the checklist because [FE1's] store didn't have enough hours to have a pharmacy tech there all day long."  "There were times I was by myself as a pharmacist.  You don't have time for it."  "And nobody enforced it one way or the other."

98.     FE4 also stated that Walgreens had a "promise time" of 15 minutes or less to dispense medications for customers who waited in the store.  Moreover, according to FE4, patients seeking pain medications and opioids were frequently the ones waiting and "refusing to leave."  They were also the "most aggressive patients" and the "likeliest to complain."  Dealing with these patients negatively affected the pharmacy's customer satisfaction score and ability to dispense prescriptions in a timely manner, FE4 said.

99.     FE2 confirmed that Walgreens' pharmacists did not have enough time to properly evaluate prescriptions before filling them.  "Walgreens did not give pharmacists enough time to evaluate prescriptions before filling them," according to FE2.  "Understaffing was a huge issue," FE2 said.  "It was rampant across the company.  You'll get that from every single pharmacist.  We

were severely understaffed for the amount of prescriptions we were doing to the point where the time, attention, and care each prescription needed was not available." FE2 said at the busiest Walgreens FE2 worked at, in East Orange, N.J, pharmacists were filling 1,000 prescriptions a day, many of which were opioids.

100.    FE6 likewise confirmed that Walgreens did not give pharmacists enough time to properly evaluate prescriptions before filling them. FE6 worked for Walgreens from January 2010 to June 2018 as a Senior Certified Pharmacy Technician, Pharmacy Intern and Pharmacy Manager and from February 2022 to February 2024 as a Pharmacy Manager. FE6 noted that Walgreens' technology system was deficient and contributed to pharmacists' inability to evaluate prescriptions properly before filling them in the time allowed.

101.    FE8 similarly stated that Walgreens systematically pressured pharmacists to fill prescriptions quickly. FE8 worked as a staff pharmacist at Walgreens locations in Florida, including Lake Wales, from June 2022 to September 2024. Before that, FE8 worked at Walgreens from 2001 to 2007. In between, FE8 owned a pharmacy business for almost 18 years. FE8 stated that younger pharmacists were most likely to cave to this pressure to fill prescriptions quickly (at the expense of properly evaluating whether the prescriptions were legitimate).

102.    FE5 said that Pharmacy staff did not have enough time or support to properly evaluate controlled substance prescriptions. "They sure did not," FE5 said, and added that this was especially true if they had to look up a patient or prescriber in a state database. "They didn't have the time." FE5 explained that there was not have enough staff to handle the volume of prescriptions that they saw.

103.    When asked whether Walgreens did not permit pharmacists sufficient time to review whether prescriptions were properly verified, FE9 said, "I can definitely confirm that." FE9 worked for Walgreens from July 2017 to November 2022 in various roles with the company's Specialty Pharmacy. FE9 worked in Pittsburgh. Moreover, FE9's aunt worked as a Walgreens pharmacy technician in Pittsburgh and told FE9 that she struggled with the workload because of

Walgreens' "very fast-paced" environment and demands that were "almost like to an unmanageable degree."

### C. Walgreens Pressured Pharmacists To Fill as Many Prescriptions as Possible

#### 1. Walgreens Incentivized Pharmacists To Fill Prescriptions

104. Walgreens pharmacists' job performance, and their compensation and bonuses, were evaluated by the speed of filling prescriptions, patient wait time, and volume of prescriptions filled. In this way, Walgreens incentivized pharmacists not to turn customers away and to fill as many prescriptions as possible as quickly as possible, without regard to complying with any policies designed to prevent improper dispensing of opioids.

105. According to FE10, Walgreens pharmacists' job performance and bonuses were evaluated by the speed of filling prescriptions, patient wait time, and volume of prescriptions filled. FE10 worked as a Staff Pharmacist for Walgreens at stores in Buffalo Grove, Illinois and Arlington Heights, Illinois from 1976 to 2023. FE10 reported to a Pharmacy Manager who reported to a District Manager.

106. FE2 confirmed that Walgreens evaluated a pharmacist's job performance based on speed of filling prescriptions, patient wait time, and volume of prescriptions. FE2 also stated that a pharmacist's compensation, including bonuses, was tied to these metrics. "It was a combination of those things," FE2 said. FE2 said there was no incentive to turn suspicious customers away. FE2 said pharmacists had a quota to reach and that "it was never reasonable." Indeed, according to FE2, Walgreens incentivized pharmacists not to turn customers away in order to meet quotas.

107. FE11 confirmed that Walgreens evaluated a pharmacist's job performance by the speed of filling prescriptions, patient wait time, volume of prescriptions and indeed "all the metrics you can think of – waiters, on time, promise time, etc." According to FE11, Walgreens' pharmacists had no incentive to turn suspicious customers away and instead had strong incentive to fill as many prescriptions as possible as quickly as possible.

108.    FE1 also stated that bonus was evaluated based on metrics like speed of filling prescriptions, patient wait time, and Verify by Promise Time for "waiters," for any type of prescription, including opioids.  FE1 said there was a 15-minute limit for waiters, and that compliance with that policy directly impacted a pharmacist's bonus.

109.    Walgreen's pharmacies were incentivized at the store level to increase the number of prescriptions filled.  According to FE4, pharmacies had to "post increases" in prescription volume "year after year."  If volume decreased, Walgreens required pharmacies to "come up with an action plan" to reverse the decline, FE4 said.

### 2.    Walgreens Retaliated Against Pharmacists Who Refused To Fill Suspicious Prescriptions

110.    Many Walgreens pharmacists reported having managers question their decisions to reject controlled-substance prescriptions, or having managers instruct them to fill future controlled-substance prescriptions the pharmacist had rejected or believed should not be filled. Walgreens pharmacists reported being pressured to fill not just by managers with pharmacy training, but also by non-pharmacist store managers with no such experience.

111.    According to FE8, Walgreens pressured its pharmacists to fill dubious scrips to maximize the number of prescriptions filled.  Walgreens disguised this pressure as a concern about minimizing customer complaints.  According to FE8, if a pharmacist refused to fill a prescription, the customer sometimes complained to the store manager, district office, or corporate.  Managers would then approach the pharmacist, admonishing them for "driving customers away," or casting the chain pharmacy brand in a negative light.  The subtext was clear:  stop refusing to fill scrips if you want to keep your job.  FE8 said the pressure stemmed from management's desire to meet numerical targets and profitability goals.  FE8 said managers were concerned about Key Performance Indicators (KPIs) that included the number of prescriptions filled.  FE8 observed other pharmacists "cave" to the pressure from management to fill medically unnecessary prescriptions for opioid pain medications.

112.    According to FE2, sometimes pharmacy managers did not feel comfortable with a prescription yet nevertheless were pressured from their district managers to satisfy the customer after the customer complained.  The customer would call the corporate line to complain, the complaint would go to the District Manager, and that Manager would speak to the pharmacy manager and say "Hey. Why didn't you fill this?'" FE2 said.  The district managers would pressure the pharmacists to fill the prescriptions "by means of disciplinary action, they could take it out on the performance review or there'd be retaliation in other ways," FE2 said.  FE2 stated that some pharmacists were ordered to fill prescriptions over their concerns by their District Manager.

113.    According to FE11, pharmacists feared retaliation from their non-pharmacist store managers if they did not fill enough prescriptions.  "If you did not meet your metrics you may not get that annual raise."  FE11 was a Pharmacy Manager at Walgreens from November 2006 to September 2021 in Virginia.  FE11 reported to the Store Manager who reported to the District Manager.  FE11 explained that at Walgreens, the Pharmacy Manager reports to the Store Manager and the Store Manager gives the Pharmacy Manager the yearly performance review, so any issues about filling prescriptions will affect the performance review of the Pharmacy Manager, which affects their likelihood of a raise.

114.    FE11 stated:

I think Walgreens has the wrong business structure.  [. . .] Their store manager is technically the person in charge of the pharmacy manager and how can that be if they don't . . . have any schooling?  They're in the customer service game.  We're in the patient care game.  That's two different avenues. [. . .] The customer service aspect is 'just fill it.  And when people have questions the managers are thinking about the bottom line of get more scripts.  The managers aren't thinking about the bottom line of safety.  And the store manager is the person who does your yearly job performance review.  That's the person that says whether you get a raise or not so if you do not have a good relationship with your store manager that can affect your bottom line.  You can get not achieving expectations.

115.    FE11 explained that Walgreens was unique in this reporting structure—at other pharmacies like Walmart, pharmacy managers reported to district managers who were themselves trained in pharmacology.  According to FE11, Walgreens' reporting structure incentivizing profit over safety is "why they were chasing metrics."

116. FE12 explained that while Walgreens claimed to support pharmacists' decisions to refuse to fill prescriptions but docked them for "poor customer service" if customers complained. FE12 worked for Walgreens from June 2005 to March 2016, working first as a Staff Pharmacist at a Walgreens pharmacy in Kingsport, TN, then as a to Pharmacy Manager in Johnson City, TN. According to FE12, when performing due diligence steps in filling prescriptions took longer than the Company wanted—which was often the case—Walgreens criticized pharmacy staff for "poor customer service," which could lead to the staff being disciplined, FE12 said. If "this patient was unhappy with the time" to fill a prescription, or if a patient was unhappy with a pharmacist's decision to not to fill a prescription, management would reprimand pharmacy staff. FE12 attributed this problem to "the people making decisions not having clinical judgment," because store managers who oversaw pharmacy managers were not trained pharmacists.

117. According to FE10, Walgreens store managers would tell pharmacists to "fill everything." Moreover, FE10's decisions not to fill prescriptions were frequently overridden if a customer complained to corporate customer service.

118. The DOJ Investigation uncovered similar reports. Indeed, in February 2018, Walgreens's compliance department received a report from Pharmacist J stating, "I have been pressured by [an upper-level manager] to break controlled substance laws" and describing how he had been "pressured to fill" and told to bring concerns to his non-pharmacist store manager.

### D. Walgreens Did Not Employ Technology To Prevent Improper Dispensing of Opioids

#### 1. Walgreens Had No Formal Technological System in Place to Prevent Improper Dispensing of Opioids

119. While Walgreens easily could have implemented technology to assist pharmacists in keeping track of, and blocking, illegal and suspicious prescribers, and in identifying "red flags" raised by particular prescriptions, such as a high quantity of opioids or a "trinity" prescriptions, Walgreens implemented no such technology. Indeed, Walgreens actually prevented pharmacists from using rudimentary systems, like notes in a prescriber's profile, to keep track of problematic

prescribers. While peer pharmacies like Wal-Mart automatically alerted pharmacists to suspicious red flags, and CVS integrated their system PDMPs to facilitate checking the validity of prescribers and prescriptions, Walgreens employed no such technology.

120. Former employees have confirmed as much. According to FE2, Walgreens had no formal system in place at all for pharmacists to keep track of suspicious prescribers or "pill mill" doctors in their region. There was "no hardline system block or procedure that would prevent" filling prescriptions from such prescribers.

121. FE3 agreed that Walgreens had no system at all in place to keep track of doctors who were suspicious, under investigation, or being prosecuted for being "pill mills." FE3 confirmed that senior management never directed FE3 to keep track of "pill mill" doctors at any time when FE3 worked at Walgreens.

122. FE1 likewise confirmed that Walgreens had no formal technological system in place to prevent improper opioid dispensing. Likewise, FE1 stated that Walgreens did not require its pharmacists to keep a "do not fill" list for doctors who were suspicious, under investigation or prosecuted for being "pill mills."

123. FE13 stated that Walgreens maintained no systematic safeguards against suspicious prescribing. FE13 served as a staff pharmacist at various Walgreens locations in the Cape Coral, FL, and Fort Meyer, FL, area from June 1991 to September 2016. According to FE13, the Company did not maintain a blacklist of problem doctors.

124. Indeed, according to FE12, Walgreens' management instructed pharmacists not to block individual prescribers, regardless of red flags. FE12 said the guidance from Walgreens was essentially that "we don't make blanket statements" about specific prescribers. The Walgreens pharmacies where FE12 worked never took the step to stop filling all prescriptions from an individual prescriber, FE12 said. FE12 attributed this policy to the Company's fear of lawsuits from physicians.

125. Walgreens failed even to use the systems it did have to prevent improper dispensing of opioids. Walgreens's had a "drug utilization review" (DUR) system, a computer system that

notified Walgreens pharmacy staff of potential drug interactions, overutilization, or duplication of therapy when they entered prescription information into Walgreens's systems. However, according to FE1, Walgreens DUR system "did not automatically warn you when you got a prescription for an opioid, a benzo, and a muscle relaxant." "I worked for Walmart briefly and they had it . . . . With Walgreens I probably had patients on it but never realized it because they didn't flag it. That was something that was never discussed . . . . There was no talk of the holy trinity." The DUR system likewise did not warn you if a prescription was being filled four or more days early, FE1 said.

126. Similarly, according to FE6, Walgreens' system was not integrated with the state-run prescription drug monitoring programs (PDMPs). According to FE6, if Walgreens pharmacists wanted to check these state PDMP databases, they had to do so "manually," without the aid of any assisting Walgreens' technology. This made the work "very slow" and was a "waste of time," FE6 said. FE6 said this differed from FE6's experience at CVS, where the PDMPs were integrated with the pharmacy software system, meaning checks could be conducted automatically, without having to leave the pharmacy software system.

127. FE7 stated that Walgreens did not have any system to generate red flags and prevent filling of prescriptions, unlike its peer Wal-Mart. FE7 had previously conducted pharmacy-related compliance monitoring analytics for Wal-Mart, and said that Walgreens' systems and processes were not as effective as Wal-Mart's. At Walmart, when a red flag popped up on a prescription and "something was super outside the norm," the matter "would get looked into." If a prescription was flagged, "they stopped the fill until they could figure out what it was." Walgreens, meanwhile, "didn't have anything like that," FE7 said. "If something did get stopped, it was all on the front end at the pharmacy. They didn't seem to have a super robust way of investigating it." At Walgreens, "I felt like requests" about prescriptions "came after the fact. There wasn't any proactive stuff that they were doing." For Walgreens, "a company that had 8,000 more pharmacies than Walmart, it was surprising how much smaller their compliance area was," FE7 said.

### 2. RxIntegrity Prohibited Pharmacies from Using IntercomPlus Prescriber Profiles To Warn of "Candy Docs"

128. Walgreens maintained a shared computer system called "IntercomPlus" or "IC+" that Walgreens pharmacists accessed and used when dispensing medication. IntercomPlus included both patient profiles and prescriber profiles in which pharmacists could record and share information.

129. However, according to the DOJ Investigation, RxIntegrity expressly prohibited pharmacists from using IntercomPlus prescriber profiles to warn other pharmacists about prescribers of concern supposedly due to concerns that Walgreens would be accused of slander by such prescribers. RxIntegrity repeatedly instructed pharmacy personnel that they could not record descriptive comments "such as 'prescriber under investigation'" in a prescriber's IntercomPlus profile. Further, RxIntegrity employees deleted warning comments such as "Candy Doc" and "md had his license revoked from multiple states and is sanctioned from Medicare/Medicaid programs. Pt not allowed to pay cash/consider invalid rx[,]" from the IntercomPlus system.

130. Moreover, though the TDGFD Policy specifically required pharmacists to document refusals to fill prescriptions for Target Drugs, Walgreens imposed a 320-character limit on the comment box where such refusals were to be documented. RxIntegrity instructed pharmacists who needed to leave new comments to delete older comments, including documentation of refusals to fill that would have provided other Walgreens pharmacists with critical information.

### E. Walgreens Violated the CSA and FCA

131. As detailed in the compliant resulting from the DOJ Investigation, as a result of Walgreens' policies and the pressure to fill from management, Walgreens's pharmacists filled millions of invalid controlled-substance prescriptions during the relevant periods.

132. Walgreens dispensed millions of prescriptions raising egregious red flags. These included: (i) prescriptions with very high opioid dosages, including prescriptions that—individually or in combination—provided a patient with daily opioid dosages of greater than or

equal to 300 MME; (ii) prescriptions for opioids, benzodiazepines, and muscle relaxants that, when combined, comprise a "trinity"; and (iii) prescriptions for Schedule II opioids filled significantly early.

133.    Before and during the Class Period, Walgreens repeatedly violated the CSA by filling invalid controlled substance prescriptions in violation of § 1306.04(a).  Indeed, in *City and County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936 (N.D. Cal. Aug. 10, 2022), a United States District Court found that Walgreens pharmacists knowingly filled hundreds of thousands of invalid prescriptions that raised one or more red flags without resolving those red flags, in violation of 21 C.F.R. § 1306.04(a), in just a single locality.

134.    The table below reflects several patients for whom Walgreens filled hundreds of prescriptions that—individually or in combination—provided the patient with very high daily opioid dosages of greater than or equal to 300 MME.  The prescriptions are listed in Exhibit A.

| Patient | Number of High MME Prescriptions |
|---|---|
| Patient P.M. | 827 |
| Patient J.J. | 823 |
| Patient B.C. | 742 |
| Patient P.G. | 665 |
| Patient L.W. | 620 |
| Patient D.G. | 220 |
| Patient R.F. | 219 |
| Patient N.B. | 197 |

135.     The table below reflects several patients for whom Walgreens filled hundreds of prescriptions for opioids, benzodiazepines, and muscle relaxants that, when combined, comprised a trinity, listed in Exhibit A.

| Patient | Number of Early Fill Prescriptions Filled by Walgreens |
|---------|------------------------------------------------------|
| Patient W.M. | 153 |
| Patient D.H. | 149 |
| Patient T.B. | 146 |
| Patient J.P. | 136 |
| Patient J.H. | 134 |

136.     The table below reflects several patients for whom Walgreens filled over one hundred opioid prescriptions significantly early, listed in Exhibit A.

| Patient | Number of Trinity Prescriptions |
|---------|--------------------------------|
| Patient M.C.1 | 560 |
| Patient M.B. | 495 |
| Patient R.S. | 417 |
| Patient M.C.2 | 390 |
| Patient W.C. | 371 |

137.     When they filled these prescriptions, Walgreens pharmacists actually knew—or at a minimum, were willfully blind to the fact—that they were filling invalid prescriptions, including prescriptions written by prescribers not acting in the usual course of professional practice.

138.     The prescriptions above that were paid for by Federal Healthcare Programs are listed in Exhibit A.  Each of these were filled by Walgreens stores that had Walgreens DEA registration numbers and NPI numbers.  The reimbursements for these prescriptions were sent into an account in Walgreens's control.  The claims for the prescriptions that were reimbursed by Federal Healthcare Programs were false because they were not valid, were not for a medically accepted indication, and/or were not medically necessary.  Walgreens knowingly presented, or caused to be presented, these false claims for payment to Federal Healthcare Programs.

139.    From at least August 10, 2012, to March 1, 2023, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).  As a direct, proximate, and foreseeable result of Walgreens's dispensing of controlled substances without valid prescriptions, for medically unnecessary uses, and not for medically accepted indications, Walgreens caused false claims to be submitted to Federal Healthcare Programs which were not eligible for reimbursement.  The Federal Healthcare Programs paid Defendants' claims for these false or fraudulent claims.  If the Federal Healthcare Programs had known that the claims presented for payment were for the dispensation of prescription drugs that were not for a medically accepted indication, not medically necessary and/or not authorized by a valid prescription, they would not have paid the claims.

140.    From at least August 10, 2012, to March 1, 2023, Defendants knowingly made, used, or caused to be made or used false records or statements in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B). As a direct, proximate, and foreseeable result of Walgreens's dispensing of controlled substances without valid prescriptions, for medically unnecessary uses, and not for medically accepted indications, Walgreens caused false records or statements to be submitted to Federal Healthcare Programs—in the form of, inter alia, false claims data, false certifications, and false attestations—that were material to the payment of false or fraudulent claims for reimbursement for the dispensation of prescription drugs that were not for a medically accepted indication, lacked medical necessary, and/or were not authorized by a valid prescription.

## VII.    DEFENDANTS MISLED INVESTORS TO BELIEVE THAT WALGREENS WAS TAKING ACTIONS TO PREVENT IMPORPER DISPENSING OF OPIOIDS THAT IT WAS NOT TAKING

### A.    Defendants Misled Investors to Believe that Walgreens "Supports Pharmacists' Right To Refuse To Fill" Opioid Prescriptions and Did Not "Support[] Pharmacists in Upholding the Oath of a Pharmacist"

141.    During the Class Period, Defendants assured investors that "Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions."  For example, on

February 22, 2022, Walgreens issued a press release announcing the release of the Company's fiscal 2021 ESG Report. With respect to opioid abuse prevention, the 2021 ESG Report stated:

> Walgreens maintains a Good Faith Dispensing policy, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. This policy requires a pharmacist to evaluate the patient, the prescriber, the drug, the applicable law and the surrounding circumstances prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. **Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions** in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.

142. Walgreens did not "support [its] pharmacists right to refuse to fill" opioid prescriptions. As explained above, Walgreens systematically undermined its pharmacists' ability to evaluate whether dispensing an opioid under a given prescription was proper. Walgreens did not give pharmacists sufficient time to evaluate whether prescriptions were proper, and Walgreens pressured pharmacists to fill as many prescriptions as possible in order to keep their jobs or to achieve bonuses or promotions. Indeed, Walgreens pressured its pharmacists to fill prescriptions even when "prescribers d[id] not provide sufficient supporting information." In this way, not only did Walgreens fail actively to support its pharmacists right to refuse to fill dubious prescriptions, but Walgreens effectively *prevented* its pharmacists from exercising that right.

## B. Defendants Misled Investors To Believe that Walgreens "Maintain[ed] a Good Faith Dispensing Policy" That It Followed

143. During the Class Period, Defendants also misled investors to believe that Walgreens "maintain[ed] a Good Faith Dispensing policy." As above, in Walgreens' 2021 ESG Report, released February 22, 2022, Walgreens stated:

> **Walgreens maintains a Good Faith Dispensing policy**, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. **This policy requires a pharmacist to evaluate the patient, the prescriber, the drug, the applicable law and the surrounding circumstances** prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.

144.    In fact, the statement that Walgreens "maintain[ed]" a Good Faith Dispensing policy was at best half true.  As explained in detail above, Walgreens had not enforced such a policy before or during the Class Period, so Walgreens did not "maintain" a Good Faith Dispensing policy in the important sense that the GFD Policy was not effectively implemented and did not effectively govern pharmacists' actions.  Moreover, as the GFD Policy was not mandatory, was not enforced, and was not followed, the policy did not "require[]" anything from pharmacists.

### C.    Walgreens Misled Investors To Believe that It Used "Technology To Help Pharmacists Ensure That They Were Dispensing [Legitimate] Prescriptions"

145.    Defendants also assured investors during the Class Period that Walgreens was using "technology to help pharmacists ensure that they were dispensing [legitimate] prescriptions."  For example, on May 5, 2022, Walgreens issued a press release announcing that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state.  The press release stated, in relevant part:

> Walgreens has taken a number of actions to prevent and respond to the opioid crisis, while continuing to serve patients, including:
>
> [. . .]
>
> • **Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose**

146.    Walgreens did not "deploy technology to help pharmacists ensure that they [we]re dispensing [opioids] written for a legitimate medical purpose."  As explained above, Walgreens deployed no such technology.  In fact, Walgreens failed to provide any of the technology provided to pharmacists at peer pharmacies such as Wal-Mart and CVS.  Walgreens' "drug utilization review" system did not alert pharmacists to red flags when filling suspicious opioid prescriptions like Wal-Mart's system, and Walgreens' system was not integrated with state prescription drug monitoring programs like CVS's.

**D.**   **Defendants Falsely Assured Investors That Walgreens Complied with Applicable Laws and Regulations Concerning Dispensing Medication and Submitting Claims to the Government**

147.   Finally, throughout the Class Period, Defendants misled investors to believe that Walgreens complied with applicable healthcare laws, when in fact it was rampantly violating them. For example, on October 14, 2021, Walgreens filed an Annual Report on Form 10-K with the SEC, that incorporated the Company's Code of Conduct and Business Ethics. That Code, which was available to investors on Walgreens' website throughout the Class Period, stated:

**We comply with healthcare laws**

[. . .]

**WBA will not engage in illegal or fraudulent healthcare payments or practices**. We are regulated by many laws that are designed to prevent, detect and punish fraud, waste and abuse. Therefore, **WBA prohibits employees from knowingly submitting false or fraudulent claims for healthcare services or products to any government agency** or third party.

148.   In fact, Walgreens did not "comply with healthcare laws." As detailed above, Walgreens rampantly violated the CSA and FCA. Walgreens violated the CSA by dispensing opioids under invalid prescriptions written by "candy doc" prescribers, and Walgreens violated the FCA by repeatedly submitting false claims to the government to be reimbursed for dispensing these invalid prescriptions. Moreover, Walgreens did "engage in illegal or fraudulent healthcare payments or practices" by routinely submitting false claims to the government. Likewise, Walgreens did not "prohibit[] employees from knowingly submitting false or fraudulent claims for healthcare . . . products" to the government, as Walgreens facilitated such misconduct through policies that encouraged pharmacists to dispense opioids improperly.

**E.**   **A Series of Disclosures Revealed That Walgreens Had Misled Investors, and Investors Suffered Losses**

149.   As detailed below, the truth that Walgreens had again been misleading the public about its responses to the opioid crisis was partly revealed, and the risks Walgreens concealed with its misleading statements materialized, over a series of disclosures.

150.   On January 5, 2023, Walgreens reported that "a huge opioid settlement dragged

Walgreens to a $3.7 billion loss in its fiscal first quarter." On June 27, 2023, the Tenth District Court of Appeals ruled that opioid overdoses could be traced to Walgreens' failure to flag the large number of pills prescribed to individuals filling prescriptions.

151. Then on January 17, 2025, the DOJ announced the filing of a civil complaint (the "DOJ Complaint") alleging that Walgreens "dispensed millions of unlawful prescriptions in violation of the Controlled Substances Act (CSA) and then sought reimbursement for many of these prescriptions from various federal health care programs in violation the False Claims Act (FCA)." Specifically, the DOJ's "complaint alleges that, from approximately August 2012 through the present, Walgreens knowingly filled millions of prescriptions for controlled substances that lacked a legitimate medical purpose, were not valid, and/or were not issued in the usual course of professional practice," including "prescriptions for dangerous and excessive quantities of opioids, prescriptions for early refills of opioids and prescriptions for the especially dangerous and abused combination of drugs known as the 'trinity,' which is made up of an opioid, a benzodiazepine and a muscle relaxant."

152. In the subsequent days and weeks, on January 27, 2025 and February 11 and 28, 2025, additional information about Walgreens' liability for opioids was revealed to the public.

153. As a result of Defendants' wrongful misstatements and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VIII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A. Defendants' False and Misleading Statements in 2020

#### 1. October 15, 2020

154. On October 15, 2020, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2020. With respect to corporate governance, the 2020 10-K incorporated the Company's Code of Conduct and Business Ethics:

> The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations. The Company has also adopted a Code of Ethics for CEO and Financial Executives. This Code applies to and has been signed by the Chief Executive Officer, the Chief Financial Officer and the Chief Accounting Officer.[11]

The Company's Code of Conduct and Business Ethics contained an introduction from Defendant Pessina and stated:

> **We comply with healthcare laws**
>
> [. . .]
>
> **WBA will not engage in illegal or fraudulent healthcare payments or practices**. We are regulated by many laws that are designed to prevent, detect and punish fraud, waste and abuse. Therefore, **WBA prohibits employees from knowingly submitting false or fraudulent claims for healthcare services or products to any government agency** or third party.

155. The statements above were materially false and misleading because: (1) Walgreens did not "comply with healthcare laws," as it rampantly violated the CSA and FCA; (2) Walgreens did "engage in illegal or fraudulent healthcare payments or practices" by routinely submitting false claims to the government; and (3) Walgreens did not "prohibit[] employees from knowingly submitting false or fraudulent claims for healthcare . . . products" to the government, as Walgreens facilitated such misconduct through policies that encouraged pharmacists to dispense opioids improperly.

**B.    Defendants' False and Misleading Statements in 2021**

**1.    April 23, 2021**

156. On April 23, 2021, the Company issued a press release entitled "Walgreens Encourages All Americans to Participate in National Prescription Drug Take Back Day." The press release stated that the Company is "**leading the fight against prescription drug abuse with programs to help curb the misuse of medications and reduce the rise in overdose deaths**."

---

[11] All emphases are added unless otherwise indicated.

157.    The statements above were materially false and misleading because Defendants told, at best, a half-truth in stating that Walgreens had "programs to help curb the misuse of medications and reduce the rise in overdose deaths." In fact, Walgreens' policies and procedures systematically contributed to the improper dispensing of opioids, and so contributed to misuse of, and deaths from, opioids.

### 2.    October 14, 2021

158.    On October 14, 2021, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2021. With respect to corporate governance, the 2021 10-K incorporated the Company's Code of Conduct and Business Ethics and stated:

> The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that **incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations**. The Company has also adopted a Code of Ethics for CEO and Financial Executives. This Code applies to and has been signed by the Chief Executive Officer, the Chief Financial Officer and the Chief Accounting Officer.

The Company's Code of Conduct and Business Ethics contained an introduction from Defendant Pessina and stated:

> **We comply with healthcare laws**
>
> [. . .]
>
> **WBA will not engage in illegal or fraudulent healthcare payments or practices**. We are regulated by many laws that are designed to prevent, detect and punish fraud, waste and abuse. Therefore, **WBA prohibits employees from knowingly submitting false or fraudulent claims for healthcare services or products to any government agency** or third party.

159.    The statements above were materially false and misleading because: (1) Walgreens did not "comply with healthcare laws," as it rampantly violated the CSA and FCA; (2) Walgreens did "engage in illegal or fraudulent healthcare payments or practices" by routinely submitting false claims to the government; and (3) Walgreens did not "prohibit[] employees from knowingly submitting false or fraudulent claims for healthcare . . . products" to the government, as Walgreens

facilitated such misconduct through policies that encouraged pharmacists to dispense opioids improperly.

**C.      Defendants' False and Misleading Statements in 2022**

**1.      February 22, 2022**

160.    On February 22, 2022, Walgreens issued a press release announcing the release of the Company's fiscal 2021 ESG Report.  With respect to opioid abuse prevention, the 2021 ESG Report stated, in relevant part:

> **Our stakeholders expect us to play a significant role in helping to address the U.S. opioid epidemic**, given our influence as a leader in the retail pharmacy industry, our scale of operations and our expansive reach across local communities. Walgreens is focused on collaborative solutions, working with government and business partners on drug take back and addiction mitigation initiatives. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our multi-million dollar effort to help combat overdose-related deaths.
>
> [. . .]
>
> **Walgreens maintains a Good Faith Dispensing policy**, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. **This policy requires a pharmacist to evaluate the patient, the prescriber, the drug, the applicable law and the surrounding circumstances** prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. **Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions** in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.

161.    The statements above were materially false and misleading because:  (1) the statement that Walgreens "maintains" a good faith dispensing policy was at best half true, as Walgreens had not enforced such a policy before or during the Class Period; (2) the GFD Policy was not mandatory, was not enforced, and was not followed, so the policy did not "require[]" anything from pharmacists; and (3) Walgreens did not "support [its] pharmacists right to refuse to fill" opioid prescriptions because Walgreens (a) did not give pharmacists sufficient time to evaluate whether prescriptions were proper, (b) Walgreens pressured pharmacists to fill as many prescriptions as possible in order to keep their jobs or to achieve bonuses or promotions.

### 2. May 5, 2022

162.     On May 5, 2022, Walgreens issued a press release announcing that it had reached an opioid settlement of $683 million with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the Company's pharmacies in the state.  However, that same press release stated, in relevant part:

> Walgreens has taken a number of actions to prevent and respond to the opioid crisis, while continuing to serve patients, including:
>
> [. . .]
>
> • **Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose**

163.     The statements above were materially false and misleading because Walgreens did not "deploy technology to help pharmacists ensure that they [we]re dispensing [opioids] written for a legitimate medical purpose."  Walgreens deployed no such technology.  In fact, Walgreens failed to provide any of the technology provided to pharmacists at peer pharmacies such as Wal-Mart and CVS.

### 3. October 13, 2022

164.     On October 13, 2022, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2022.  With respect to corporate governance, the 2022 10-K stated, in relevant part:

> The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that **incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations**.  The Company has also adopted a Code of Ethics for CEO and Financial Executives.  This Code applies to and has been signed by the Chief Executive Officer, the Chief Financial Officer and the Chief Accounting Officer.

The Company's Code of Conduct and Business Ethics contained an introduction from Defendants Pessina and Brewer and stated:

**We comply with applicable pharmacy and healthcare laws and regulations around the globe**

[. . .]

**We adhere to laws relating to government . . . programs**

Government programs such as Medicare in the U.S. and the National Health Service (NHS) in the UK pay for many of the healthcare products and services offered through our retail and specialty pharmacies.

[. . .]

We uphold our high ethical standards when **we appropriately submit claims and bill government programs**. **We follow applicable laws and regulations** including accurately documenting the required information to bill for products and services that are provided to government healthcare program beneficiaries.

165. The statements above were materially false and misleading because: (1) Walgreens did not "comply with applicable pharmacy and healthcare laws," "adhere to laws relating to government . . . programs," or "follow applicable laws and regulations" relating to billing Medicare, as it rampantly violated the CSA and FCA; and (2) Walgreens did not "appropriately submit claims and bill government programs" because it routinely submitted false claims to the government.

### 4.      October 27, 2022

166. On October 27, 2022, the Company issued a press release entitled "Walgreens Encourages Everyone to Take Part in National Drug Take Back Day Oct. 29" which stated, in relevant part, that "Walgreens is leading the fight against prescription drug abuse **with programs to help curb the misuse of medications and reduce the rise in overdose deaths**[.]"

167. The statements above were materially false and misleading because Defendants told, at best, a half-truth in stating that Walgreens had "programs to help curb the misuse of medications and reduce the rise in overdose deaths." In fact, Walgreens' policies and procedures systematically contributed to the improper dispensing of opioids, and so contributed to misuse of, and deaths from, opioids.

### 5.    November 2, 2022

168.    On November 2, 2022, the Company issued a press release announcing that it had agreed in principle to a multi-state opioid settlement framework to resolve claims that Walgreens mishandled prescriptions of opioid painkillers.  The press release stated that "[u]nder these frameworks, the company expects to settle all opioid claims against it by participating states, subdivisions and tribes, for up to approximately $4.95 billion in remediation payments to be paid out over 15 years."  However, that same press release stated, in relevant part:

> Walgreens has taken a number of actions over many years to respond to the opioid crisis, while continuing to serve patients, including:
>
> [. . .]
>
> - **Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose**[.]

169.    The statements above were materially false and misleading because Walgreens did not "deploy technology to help pharmacists ensure that they [we]re dispensing [opioids] written for a legitimate medical purpose."  Walgreens deployed no such technology.  In fact, Walgreens failed to provide any of the technology provided to pharmacists at peer pharmacies such as Wal-Mart and CVS.

### D.    Defendants' False and Misleading Statements in 2023

### 1.    March 10, 2023

170.    On March 10, 2023, Walgreens issued a press release announcing the release of the Company's fiscal 2022 ESG report.  With respect to "prescription misuse prevention," the 2022 ESG report stated, in relevant part:

> **Prescription misuse prevention is a priority for our pharmacy staff.**  Our status as a leader in the retail pharmacy industry and our expansive reach across communities allow us to play a significant role in addressing the opioid epidemic. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our multimillion-dollar effort to help combat overdose-related deaths.
>
> **Walgreens maintains a Good Faith Dispensing policy**, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. **This policy requires a**

**pharmacist to evaluate the patient, prescriber, drug, applicable law and surrounding circumstances** prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. **Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions** in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.

171. The statements above were materially false and misleading because: (1) the statement that Walgreens "maintains" a good faith dispensing policy was at best half true, as Walgreens had not enforced such a policy before or during the Class Period; (2) the GFD Policy was not mandatory, was not enforced, and was not followed, so the policy did not "require[]" anything from pharmacists; (3) Walgreens did not "support [its] pharmacists right to refuse to fill" opioid prescriptions because Walgreens (a) did not give pharmacists sufficient time to evaluate whether prescriptions were proper, (b) Walgreens pressured pharmacists to fill as many prescriptions as possible in order to keep their jobs or to achieve bonuses or promotions; and (4) under Walgreens' policies, "prescription misuse prevention" was *not* "a priority for [Walgreens'] pharmacy staff," as these policies objectively prioritized maximizing the number of prescriptions filled over preventing prescription misuse and actually hindered Walgreens' pharmacy staff from preventing such misuse.

### 2. October 12, 2023

172. On October 12, 2023, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2023. With respect to corporate governance, the 2022 10-K stated, in relevant part:

The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that **incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations**. The Company has also adopted a Code of Ethics for CEO and Financial Executives. This Code applies to and has been signed by the Chief Executive Officer, the Chief Financial Officer and the Chief Accounting Officer.

The Company's Code of Conduct and Business Ethics stated:

> **We comply with applicable pharmacy and healthcare laws and regulations around the globe**
>
> [. . .]
>
> **We adhere to laws relating to government . . . programs**
>
> Government programs such as Medicare in the U.S. and the National Health Service (NHS) in the UK pay for many of the healthcare products and services offered through our retail and specialty pharmacies.
>
> [. . .]
>
> We uphold our high ethical standards when **we appropriately submit claims and bill government programs**. **We follow applicable laws and regulations** including accurately documenting the required information to bill for products and services that are provided to government healthcare program beneficiaries.

173.     The statements above were materially false and misleading because: (1) Walgreens did not "comply with applicable pharmacy and healthcare laws," "adhere to laws relating to government . . . programs," or "follow applicable laws and regulations" relating to billing Medicare, as it rampantly violated the CSA and FCA; and (2) Walgreens did not "appropriately submit claims and bill government programs" because it routinely submitted false claims to the government.

### E.     Defendants' False and Misleading Statements in 2024

#### 1.     January 26, 2024

174.     On January 26, 2024, Walgreens issued a press release announcing the release of the Company's fiscal 2023 ESG Report.  With respect to "prescription misuse prevention," the 2023 ESG report stated, in relevant part:

> **Prescription misuse prevention is a priority for our pharmacy staff.**  Our status as a leader in the retail pharmacy industry and our expansive reach across communities allow us to play a significant role in addressing the opioid epidemic. The WBA board of directors continues to oversee our management of risks related to the dispensing of prescription opioid medication and our multimillion-dollar effort to help combat overdose-related deaths.
>
> **Walgreens maintains a Good Faith Dispensing policy**, which provides the foundation for our pharmacists to understand their roles and responsibilities when dispensing prescriptions for controlled substances. **This policy requires a pharmacist to evaluate the patient, prescriber, drug, applicable law and**

**surrounding circumstances** prior to making an appropriate professional decision whether to dispense a prescription for a controlled substance. **Walgreens supports our pharmacists' right to refuse to fill controlled substance prescriptions** in accordance with their corresponding responsibility, if, among other reasons, prescribers do not provide sufficient supporting information.

175.    The statements above were materially false and misleading because: (1) the statement that Walgreens "maintains" a good faith dispensing policy was at best half true, as Walgreens had not enforced such a policy before or during the Class Period; (2) the GFD Policy was not mandatory, was not enforced, and was not followed, so the policy did not "require[]" anything from pharmacists; (3) Walgreens did not "support [its] pharmacists right to refuse to fill" opioid prescriptions because Walgreens (a) did not give pharmacists sufficient time to evaluate whether prescriptions were proper, (b) Walgreens pressured pharmacists to fill as many prescriptions as possible in order to keep their jobs or to achieve bonuses or promotions; and (4) under Walgreens' policies, "prescription misuse prevention" was *not* "a priority for [Walgreens'] pharmacy staff," as these policies objectively prioritized maximizing the number of prescriptions filled over preventing prescription misuse and actually hindered Walgreens' pharmacy staff from preventing such misuse.

## 2.    October 15, 2024

176.    On October 15, 2024, Walgreens filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended August 31, 2024. With respect to corporate governance, the 2022 10-K stated, in relevant part:

> The Company has adopted a Code of Conduct and Business Ethics applicable to all employees, officers and directors that **incorporates policies and guidelines designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations**. The Company has also adopted a Code of Ethics for CEO and Financial Executives. This Code applies to and has been signed by the CEO, the CFO and the Chief Accounting Officer.

The Company's Code of Conduct and Business Ethics stated:

> **We comply with applicable pharmacy and healthcare laws and regulations around the globe**
>
> [. . .]
>
> **We adhere to laws relating to government . . . programs**

Government programs such as Medicare in the U.S. and the National Health Service (NHS) in the UK pay for many of the healthcare products and services offered through our retail and specialty pharmacies.

[. . .]

We uphold our high ethical standards when **we appropriately submit claims and bill government programs**. **We follow applicable laws and regulations** including accurately documenting the required information to bill for products and services that are provided to government healthcare program beneficiaries.

177. The statements above were materially false and misleading because: (1) Walgreens did not "comply with applicable pharmacy and healthcare laws," "adhere to laws relating to government . . . programs," or "follow applicable laws and regulations" relating to billing Medicare, as it rampantly violated the CSA and FCA; and (2) Walgreens did not "appropriately submit claims and bill government programs" because it routinely submitted false claims to the government.

## IX.    LOSS CAUSATION

178. Throughout the Class Period, Defendants materially false and misleading statements and omissions caused the price of Walgreens common stock to be artificially inflated. Lead Plaintiff and other Class members purchased Walgreens common stock at those artificially inflated prices.

179. Through partial corrective disclosures, and materializations of concealed risks, investors and the market learned of the artificially inflation of the prices of Walgreens common stock. Lead Plaintiff and Class members suffered losses when the prices of Walgreens stock fell and eliminated this artificial inflation.

### A.    January 5, 2023

180. On January 5, 2023, Walgreens filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended November 30, 2022. On the same date, NPR published an article titled "Opioid settlement pushes

Walgreens to a $3.7 billion loss in the first quarter."[12]  As noted by NPR, the Q1 2023 10-Q showed "a huge opioid settlement dragged Walgreens to a $3.7 billion loss in its fiscal first quarter," and Walgreens "recorded a $5.2 billion, after-tax charge in the quarter that ended Nov. 30 for opioid-related litigation."

181.    This recorded major loss due to payment of opioid settlement costs was a partial materialization of risks Defendants concealed through their misstatements and omissions.

182.    Following the publication of the Q1 2023 10-Q, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $2.30 per share, or 6.13%, to close at $35.19 per share on January 5, 2023.

**B.      June 27, 2023**

183.    On June 27, 2023, Court News Ohio published an article titled "Tenth District: Family of Football Player Who Overdosed Can Pursue Pharmacy for Wrongful Death", and The Columbus Dispatch published an article titled "Family can sue Walgreens for 260 opioids given former Dublin football player, court rules."  These news agencies reported news that a wrongful death lawsuit against Walgreens was allowed to proceed by a ruling from the Tenth District Court of Appeals.[13]  The lawsuit had alleged that Walgreens had dispensed 260 doses of opioid painkillers to a high school football player less than two months after he injured his shoulder in a game, and that he died of a drug overdose.

184.    The parents of the deceased claimed the initial doses ultimately led to their son's death, and "the Tenth District Court of Appeals ruled the case could go forward, finding the family

---

[12] NPR Business, *Opioid settlement pushes Walgreens to a $3.7 billion loss in the first quarter*, https://www.npr.org/2023/01/05/1147070569/walgreens-opioid-settlement-earnings.

[13] *See* Dan Trevas, *Tenth District: Family of Football Player Who Overdosed Can Pursue Pharmacy for Wrongful Death*, Court News Ohio, https://www.courtnewsohio.gov/cases/2023/COA/0627/2023-OH-2070.asp; Jordan Laird, *Family can sue Walgreens for 260 opioids given former Dublin football player, court rules*, The Columbus Dispatch, https://www.dispatch.com/story/news/courts/2023/06/27/ohio-tenth-district-court-of-appeals-rules-dublin-familys-lawsuit-against-walgreens-can-proceed/70361486007/.

has raised a legitimate argument that the athlete's overdose could be traced the pharmacy's failure to flag the large number of pills prescribed in a short period of time."

185.     News that this case would be moving forward was a partial revelation that the Company's misstatements concerning its actions in preventing improper dispensing of opioids were false, and a materialization of risks concealed by those misstatements.

186.     On this news, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $2.95 per share, or 9.34%, to close at $28.64 per share on June 27, 2023.

### C.     January 17, 2025

187.     On January 17, 2025, the DOJ announced the filing of a civil complaint against Walgreens.   In a press release announcing the lawsuit, entitled "Justice Department Files Nationwide Lawsuit Alleging Walgreens Knowingly Filled Millions of Prescriptions that Lacked a Legitimate Medical Purpose," the DOJ stated, in relevant part:

> "This lawsuit seeks to hold Walgreens accountable for the many years that it failed to meet its obligations when dispensing dangerous opioids and other drugs," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Justice Department's Civil Division. "Our complaint alleges that Walgreens pharmacists filled millions of controlled substance prescriptions with clear red flags that indicated the prescriptions were highly likely to be unlawful, and that Walgreens systematically pressured its pharmacists to fill prescriptions, including controlled substance prescriptions, without taking the time needed to confirm their validity. These practices allowed millions of opioid pills and other controlled substances to flow illegally out of Walgreens stores."

> The complaint alleges that Walgreens pharmacists filled these prescriptions despite clear "red flags" that indicated that the prescriptions were highly likely to be unlawful. Walgreens allegedly ignored substantial evidence from multiple sources that its stores were dispensing unlawful prescriptions, including from its own pharmacists and internal data.

> The complaint further alleges that Walgreens systematically pressured its pharmacists to fill prescriptions quickly without taking the time needed to confirm each prescription's validity. Walgreens also allegedly deprived its pharmacists of crucial information, including by preventing pharmacists from warning one another about certain prescribers.

> The complaint alleges that by knowingly filling unlawful prescriptions for controlled substances, Walgreens violated the CSA and, where Walgreens sought reimbursement from federal health care programs, also violated the FCA. The complaint alleges that Walgreens's actions helped to fuel the prescription opioid

crisis and that, in some particularly tragic instances, patients died after overdosing on opioids shortly after filling unlawful prescriptions at Walgreens. If Walgreens is found liable, it could face civil penalties of up to $80,850 for each unlawful prescription filled in violation of the CSA and treble damages and applicable penalties for each prescription paid by federal programs in violation of the FCA. The court also may award injunctive relief to prevent Walgreens from committing further CSA violations.

188.    The DOJ Complaint expressly alleged that Walgreens was "aware of its obligation to exercise corresponding responsibility" and that its business practices were at odds with earlier commitments to "implement or maintain a variety of compliance measures moving forward," stating, for example:

Pharmacies serve as critical gatekeepers against the diversion of controlled substances. Federal law vests pharmacists with the authority to dispense controlled substances pursuant to a valid prescription. It also imposes on pharmacists a corresponding responsibility to confirm the validity of a prescription before dispensing the controlled substances prescribed.

For years, even as the opioid epidemic ravaged this country, Walgreens failed to meet that responsibility.

***

Moreover, Walgreens for years refused to implement a system for blocking Walgreens pharmacies from filling prescriptions written by practitioners that Walgreens knew regularly wrote illegal opioid prescriptions, even as Walgreens pharmacists requested such action, and even as some of Walgreens's major competitors instituted systems enabling them to block such prescribers.

***

As part of [a] 2011 Agreement [reached with the DEA to resolve certain administrative actions arising from alleged violations of Walgreens's responsibilities under the CSA], Walgreens agreed to maintain a compliance program to detect and prevent the diversion of controlled substances, including by regularly training Walgreens pharmacy employees on their responsibilities under the CSA and by implementing "procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills."

***

[Pursuant to the 2013 Agreement,] Walgreens also agreed to implement or maintain a variety of compliance measures moving forward.

These "Prospective Compliance" provisions, which were in effect from June 2013 through June 2016, required Walgreens to, among other things, maintain a compliance program to detect and prevent the diversion of controlled substances and to provide training to its pharmacists to ensure compliance with the CSA and its implementing regulations.

Walgreens agreed to maintain a "Department of Pharmaceutical Integrity" to coordinate its compliance efforts related to controlled substances and to instruct its pharmacists and supervisory personnel to contact the Department of Pharmaceutical Integrity to address issues arising with specific patients or physicians.

Walgreens also agreed to train its pharmacists on identifying red flags of potential diversion.

The policies Walgreens adopted also reflect its understanding that its pharmacists are required to recognize and resolve red flags prior to dispensing controlled substances. For example, Walgreens developed a "Good Faith Dispensing" (GFD) Policy to guide pharmacists in exercising their corresponding responsibility when filling controlled substances.

189.    The DOJ's lawsuit was a partial revelation that the Company's misstatements were false, and a materialization of risks concealed by those misstatements.

190.    Following the DOJ's announcement, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell $1.56 per share, or 12.06%, over the following two trading sessions, to close at $11.37 per share on January 21, 2025.

**D.    January 27, 2025**

191.    On January 24 (the prior trading day) and January 27, 2025, following the announcement of the DOJ complaint, WorkersCompensation.com published an article titled "Walgreens Lawsuit: Ripple Effects on Workers' Compensation and the Opioid Crisis", HME News published an article titled "In brief: Cybersecurity violation, Walgreens complaint, Homecare Champion nominees", and Patch published an article titled "Walgreens Dispensed Millions Of Unlawful Prescriptions: Lawsuit," revealing the scope and likely impact of the DOJ complaint.[14]

192.    These articles reported the severity of the allegations contained in the DOJ complaint:

---

[14] *See* Claire Muselman, *Walgreens Lawsuit: Ripple Effects on Workers' Compensation and the Opioid Crisis*, WorkersCompensation.com, https://www.workerscompensation.com/daily-headlines/walgreens-lawsuit-ripple-effects-on-workers-compensation-and-the-opioid-crisis/; HME News Staff, *In brief: Cybersecurity violation, Walgreens complaint, Homecare Champion*

The U.S. Department of Justice, in a civil complaint filed in the U.S. District Court for the Northern District of Illinois, alleges that Walgreens Boots Alliance, Walgreen Co. and various subsidiaries (collectively, Walgreens) dispensed millions of unlawful prescriptions in violation of the Controlled Substances Act (CSA) and then sought reimbursement for many of these prescriptions from various federal health care programs in violation the False Claims Act (FCA).

*** 

"This lawsuit seeks to hold Walgreens accountable for the many years that it failed to meet its obligations when dispensing dangerous opioids and other drugs," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the DOJ's Civil Division. "Our complaint alleges that Walgreens pharmacists filled millions of controlled substance prescriptions with clear red flags that indicated the prescriptions were highly likely to be unlawful, and that Walgreens systematically pressured its pharmacists to fill prescriptions, including controlled substance prescriptions, without taking the time needed to confirm their validity. These practices allowed millions of opioid pills and other controlled substances to flow illegally out of Walgreens stores."

The government's complaint alleges that, from approximately August 2012 through the present, Walgreens knowingly filled millions of prescriptions for controlled substances that lacked a legitimate medical purpose, were not valid and/or were not issued in the usual course of professional practice. Among the millions of unlawful prescriptions that Walgreens allegedly filled were prescriptions for excessive quantities of opioids, prescriptions for early refills of opioids and prescriptions for drugs known as the "trinity," which is made up of an opioid, a benzodiazepine and a muscle relaxant.

The complaint also alleges that Walgreens pharmacists filled these prescriptions despite clear "red flags" that indicated that the prescriptions were highly likely to be unlawful. Walgreens allegedly ignored substantial evidence from multiple sources that its stores were dispensing unlawful prescriptions, including from its own pharmacists and internal data.

The complaint further alleges that Walgreens systematically pressured its pharmacists to fill prescriptions quickly without taking the time needed to confirm each prescription's validity.

193.     Additionally, on January 27, 2025, an analyst from Leerink Partners published a

report concerning Walgreens' potential buyout and opioid related liabilities:

We always saw the potential for a transaction between WBA and Sycamore as a longshot given the size of the deal, financing considerations, and challenges finding a robust expected return. Today's stock weakness takes some of that (maybe all) deal premium out of the stock and shifts the focus back to fundamentals. Admittedly there were positive signs in the FY1Q'25 results, with an AOI beat on US Retail Pharmacy aided by ongoing restructuring. In our view, keeping that

---

*nominees*, HME News, https://www.hmenews.com/article/in-brief-cybersecurity-violation-walgreens-complaint-homecare-champion-nominees; Eric DeGrechie, *Walgreens Dispensed Millions Of Unlawful Prescriptions: Lawsuit*, Patch, https://patch.com/illinois/deerfield/walgreens-dispensed-millions-unlawful-prescriptions-lawsuit.

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

momentum will be the key driver to rebuild sentiment, although we would not be surprised to see further stock volatility as deal speculation dies down. Our outlook for the stock doesn't change here — we still think long term numbers are very much an unknown, with operational variability likely and additional headlines (such as the recent DOJ opioid suit) weighing on sentiment.

194.    Also on January 27, 2025, an analyst from Morningstar Equity published a report concerning Walgreens' potential buyout and opioid related liabilities:

Other factors that could have played a part in the cooling interest include an opioid lawsuit the US Department of Justice filed earlier this month, and, less likely but still a potential factor, a pharmacy benefit manager legislation introduced in December 2024 that could impact the US drug dispensing space.

195.    This news was a partial revelation that the Company's misstatements concerning its actions in preventing improper dispensing of opioids were false, and a materialization of risks concealed by those misstatements.

196.    On this news, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $0.53 per share, or 4.46%, to close at $11.34 per share on January 27, 2025.

**E.    February 11, 2025**

197.    On February 10, 2025, Seeking Alpha published an article titled "Walgreens: Some Roadblocks And Some Greenshoots (Rating Downgrade)" and Powell & Majestro P.L.L.C. published an article titled "Opioid Litigation in 2025: A New Chapter in the Fight for Justice", reporting Walgreens liability for opioid-related settlements and the likely impact of that liability.[15] These articles stated, for example:

It also doesn't help that over the next 15 years, WBA may end up shedding around $5bn worth of remediation payments linked to the opioid-related lawsuits.

\*\*\*

---

[15] *See* The Alpha Sieve, *Walgreens: Some Roadblocks And Some Greenshoots (Rating Downgrade)*, Seeking Alpha, https://seekingalpha.com/article/4756810-walgreens-stock-some-roadblocks-and-some-greenshoots-downgrade-hold?utm_source=bloomberg_st&utm_medium=referral&feed_item_type=article; Powell & Majestro P.L.L.C., *Opioid Litigation in 2025: A New Chapter in the Fight for Justice*, https://www.powellmajestro.com/opioid-litigation-in-2025-a-new-chapter-in-the-fight-for-justice/.

Walgreens' Settlement with Baltimore: Walgreens reached a settlement with the City of Baltimore, contributing to the city's total recoveries from opioid defendants. This settlement has set a precedent, inspiring other cities to pursue similar agreements with pharmacy chains.

198.    This news was a partial revelation that the Company's misstatements concerning its actions in preventing improper dispensing of opioids were false, and a materialization of risks concealed by those misstatements.

199.    On this news, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $0.61 per share, or 6.12%, to close at $9.36 per share on February 11, 2025.

**F.    February 28, 2025**

200.    On February 28, 2025, Barron's published an article titled "Walgreens Downgraded Amid Breakup Talk. 'The Math Doesn't Work,' Analyst Says" and YahooFinance published an article titled "Walgreens Stock Just Crashed 5.4% -- Here's the Shocking Reason Investors Are Panicking", concerning how the Company's opioid liabilities would affect a private sale of Walgreens.[16]

201.    Additionally, on February 28, 2025, an analyst report concerning the potential buyout and opioid related liabilities was published by an analyst from Deutsche Bank Research:

> From a post-deal break-up perspective, we question how one apportions liability between the three companies, and we suspect debt investors would want to know that before investing. We imagine much of the debt and the opioid and tax liabilities would reside with the US retail business, so the structure of the buyout and breakup needs to be laid out in advance.

***

---

[16] *See* Mackenzie Tatananni, *Walgreens Downgraded Amid Breakup Talk. 'The Math Doesn't Work,' Analyst Says*, Barron's, https://www.barrons.com/articles/walgreens-stock-downgrade-deustche-bank-9ac81c40; Khac Phu Nguyen, *Walgreens Stock Just Crashed 5.4% -- Here's the Shocking Reason Investors Are Panicking*, YahooFinance,
https://finance.yahoo.com/news/walgreens-stock-just-crashed-5-203230376.html?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAADsWWsCFEqERDI7XLiM7-d2tcb_ckZq5ODbsPKL93faRyoOYFDKg9Md9GwS2SEUS8_fumPTb7UtMQ42Jrk29JFbqsedmZ2m-Ow8YuMNqQmm6mc7g_KGo8GoCATCh-9jIWIsRubfTgLnRt62cD6mj_U-LnsI7cBdPI5vYUrpjKBYc&guccounter=2.

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

If WBA cannot sell either Village or Boots at an attractive price, we can envision a scenario where WBA is forced to refinance at higher costs, cut its dividend again, and possibly shoulder another opioid liability – which, combined, could sharply impact the stock price to the downside.

\*\*\*

WBA also has about $6.9B in net debt and $4B in opioid penalties.

\*\*\*

In addition to that recent cash outflow, WBA is navigating a pending IRS tax liability of $2.7B and a DOJ opioid investigation that could result in a liability of more than $1B. Every incremental $1B in debt or future liabilities impacts our SOTP by about $1.10 per share, with these pending claims representing about $4 per share in SOTP risk. Lastly, should the company make opioid payments due to its financial distress, that $4B liability would begin to PIK interest at a rate of 7% a year, representing about $300mm per year in incremental debt burden each year it goes unpaid.

202.     This news was a partial revelation that the Company's misstatements concerning its actions in preventing improper dispensing of opioids were false, and a materialization of risks concealed by those misstatements.

203.     On this news, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $0.55 per share, or 4.90%, to close at $10.68 per share on February 28, 2025.

## X.     ADDITIONAL SCIENTER ALLEGATIONS

204.     The Individual Defendants acted with scienter in that they knew or recklessly disregarded that their misstatements and omissions were materially misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements.  In addition to the facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.     Defendants Received Regular Reports on Opioid Dispensing Practices During the Class Period

205.     Walgreens' CEOs, including Defendants Pessina, Brewer, Graham and Wentworth, received regular updates on opioid dispensing practices throughout the Class Period, from 2020 onwards, according to FE14.  FE14 led pharmacy patient safety and compliance at Walgreens.

FE14 worked as a Vice President and pharmaceutical integrity director at Walgreens from January 2015 to September 2023. FE14 was based in Deerfield, Illinois, at Walgreens' corporate headquarters and reported directly to President John Standley, who reported to the CEO. As the pharmaceutical integrity director at Walgreens, FE14 oversaw the design, development, implementation, and maintenance of controlled substance policies, procedures, and order monitoring protocols across the chain's more than 9,000 retail pharmacies. FE14 prepared comprehensive briefings on compliance risks for C-suite executives and board committees, ensuring that leadership maintained visibility into the organization's regulatory standing and potential exposure areas.

206. "I know that there were regular updates to the board of directors that the CEO sat in during that time," FE14 said, referring to the Class Period and noting that the updates were delivered quarterly and annually. "The updates were given to the executives." FE14 delivered the updates on opioid dispensing practices.

207. FE14 also prepared monthly reports on Walgreens' opioid dispensing practices, submitting those to FE14's supervisor, Walgreens President John Standley, who reported to the CEO Defendants.

**B.  Board Report on Oversight of Risk Related to Opioids States Defendants Were Responsible for Managing Risks Related to Opioids**

208. Defendants were expressly responsible for managing risks related to opioids, and so had a responsibility to familiarize themselves with the Company's opioid dispensing practices and the Company's compliance (and non-compliance) with the CSA and FCA.

209. In January 2019, Walgreens' shareholders voted to force the Company to prepare the 2019 Oversight Report, in which it was required to explain the steps that the Board was taking in order to monitor and manage the opioid crisis, which required Walgreens to explain what

"governance measures Walgreens has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis in the U.S."

210. The 2019 Oversight Report expressly stated that management's responsibilities include risks related to opioids: "management is responsible . . . maintaining systems to manage major risks faced by the Company, . . . including . . . risk related to opioids."

211. The 2019 Oversight Report detailed the role in monitoring regulatory compliance and in mitigating risks concerning prescription opioids that the Board was expected to play:

> As set forth in the Company's Corporate Governance Guidelines, the Board has responsibility for overseeing risk management policies and processes designed to promote ethical conduct and legal compliance and the Company's compliance with applicable laws and regulations. As a whole and through its committees, the Board exercises oversight over the elements and dimensions of major risks that we face, including risks related to prescription opioids.

212. Walgreens' senior management also "oversees and monitors" activities of their program regarding risk mitigation:

> We have established a global enterprise risk management ("ERM") program, which is led by the Company's Global Chief Compliance and Ethics Officer. Our Governance, Risk and Compliance Committee, which is comprised of key members of senior management, oversees and monitors the activities of our ERM program and reviews, on a regular basis, the top current and emerging enterprise risks we face, as well as relevant risk mitigation activities. This global ERM approach helps the Board and its committees receive relevant information about risks and understand our risk management process.

213. Therefore, Walgreens management, including Defendants, were responsible for oversight and management of risks related to opioids, as per the 2019 Oversight Report.

## C. Walgreens' CIA Required Tracking and Reporting on Compliance Concerning Opioids to the Board

214. Walgreens' agreements with government regulators required Walgreens' executives, including Defendants, to report to the Board on the Company's compliance with those agreements, including its compliance relating to opioids. Walgreens was also required by law to know about its conduct relating to opioids and to report any suspicious opioid orders.

215. Walgreens entered into a Corporate Integrity Agreement in 2008 ("2008 CIA") with the U.S. Department of Health and Human Services' Office of Inspector General, which required

the Company to enhance and enforce Walgreens' policies and reporting procedures involving "[t]he proper and accurate documentation of medical and prescription records" and "[t]he proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The 2008 CIA also required Walgreens to design procedures that would alert the Board of any issues with drug dispensing and lack of compliance with the state and federal laws that concerned dispensing of prescription drugs. Where the Policies and Procedures did not have such features, Walgreens was required by the 2008 CIA to add and implement them by January 2009. Walgreens management, including the members of the Board, were required to receive notice of such updated policy changes, in addition to regular updates on compliance with the 2008 CIA.

216. As part of the 2013 Agreement with the DEA, Walgreens agreed to maintain a compliance program "in an effort to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." As Walgreens admitted it had previously neglected to meet the standards required by the DEA concerning suspicious order reporting, Walgreens was required to maintain a compliance program meeting those standards.

### D. ESG Report States Defendants Were Required to Know and Implement Policies

217. As per Walgreens' own ESG Report, Defendants both had access to, and were required to know and implement, the Company's policies:

> "Our Company's policies cover a range of topics, from environmental impact Code of conduct and ethics and compensation to data privacy and procurement practices. We are dedicated to upholding and implementing new policies where needed because clear guidance is a pillar of successful governance. New policies are developed in accordance with regular due diligence that cover a range of topics, including human rights. Internal policies are reviewed at least every two years, while external policies are reviewed annually. *These documents are made available to all relevant parties through our intranet and corporate website, including external partners and suppliers.* Functional Leadership within WBA for each of our internal policy commitments rests with designated employees at the executive level as delegated by the Board to the WBA Finance Committee, CEO and Global CFO, in addition to segment CFOs and other relevant management. *Each business must also have executives at the Operating Committee level responsible for implementation and management of all internal policies. We require all team members to familiarize themselves and comply with requirements of all internal policies,* in addition to following our Code of Conduct and Ethics, Ethical Trading

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

Standards, Enterprise Risk Management Policy, and all published WBA internal controls relevant to their operational duties. We hold presentations and training with relevant parties, as stipulated in select policies, with frequency dependent on business and role. These accountability actions and our work with accredited third-party auditors and extensive organizational policy library available to relevant stakeholders are how we hold ourselves accountable."

218.    Therefore, Defendants had access to all internal policies, and were required to know and implement these policies, which would include policies related to opioids.  These policies included, for example, Walgreens' VBPT policies requiring that prescriptions be filled within 15 minutes for "waiters," and policies tying performance, advancement and bonuses to the speed of filling prescriptions, patient wait time, and volume of prescriptions filled.

**E.      Defendants Knew that Walgreens Was Failing To Comply with Healthcare Laws, and So Was Under an Obligation To Investigate Whether the Company Had Achieved Compliance Before Claiming As Much to Investors**

219.    Through both settlements and court findings, Walgreens' management, including Defendants, were on notice of the Company's failure to comply with healthcare laws concerning the dispensing of opioids.  Accordingly, Defendants acted, at a minimum, with severe recklessness if they failed to investigate and determine whether Walgreens had achieved compliance with those laws prior to claiming later that Walgreens was in compliance.

220.    In Walgreens' 2013 Agreement with the DOJ, Walgreens acknowledged that some of its pharmacies dispensed, "controlled substances in a manner not fully consistent with its compliance obligations under the CSA [and] its implementing regulations."

221.    Walgreens was also found liable on August 10, 2022, by Judge Breyer in the California Action, ruling that the Company contributed to and is liable for the opioid epidemic in San Francisco, California.  Judge Breyer found that the City of San Francisco offered sufficient evidence at an April 2022 bench trial to show that the Company was involved in unreasonable conduct which was a leading factor in San Francisco's opioid epidemic in San Francisco.  As Judge Breyer ruled:

> The evidence at trial established that from 2006 to 2020, Walgreens pharmacies in San Francisco dispensed hundreds of thousands of red flag opioid prescriptions without performing adequate due diligence.  Tens of thousands of these prescriptions were written by doctors with suspect prescribing patterns.  The

evidence showed that Walgreens did not provide its pharmacists with sufficient time, staffing, or resources to perform due diligence on these prescriptions. Pharmacists experienced constant pressure to fill prescriptions as quickly as possible, and a shortage of resources to review them before dispensing. As a result of Walgreens' fifteen-year failure to perform adequate due diligence, Plaintiff proved that it is more likely than not that Walgreens pharmacies dispensed large volumes of medically illegitimate opioid prescriptions that were diverted for illicit use and that substantially contributed to the opioid epidemic in San Francisco.

222. On August 17, 2022, Walgreens was again found liable in the U.S. District Court for the Northern District of Ohio by Judge Dan Polster, who ordered Walgreens and other pharmacies to pay $650 million over 15 years to two Ohio counties after they were found liable by a jury for contributing to the opioid epidemic.

**F. Defendants Had Motive To Commit Fraud from Massive Stock Sales**

223. During the Class Period, Defendants were motivated to mislead investors and prevent a decline in the value of Walgreens' shares because Defendants were selling massive amounts of stock. Defendants Pessina, Brewer, Wentworth, Kehoe, and Mahajan each enriched themselves through large sales of shares during the Class Period.

224. Defendant Pessina made several large sales of shares during the Class Period. On October 19, 2021, Defendant Pessina sold 33,276 shares of Walgreens stock for $1,597,580.76; on November 1, 2021, Defendant Pessina sold 4,979 shares of Walgreens stock for $235,606.28; on October 26, 2022, Defendant Pessina sold 33,547 shares of Walgreens stock for $1,191,253.97; on November 1, 2022, Defendant Pessina sold 4,509 shares of Walgreens stock for $163,496.34; and on November 1, 2024, Defendant Pessina sold 19,438 shares of Walgreens stock for $183,883.48. Overall, Defendant Pessina enriched himself by selling over $3.3 million in shares of Walgreens stock during the Class Period.

225. Defendant Brewer also made several large sales of shares during the Class Period. On March 15, 2022, Defendant Brewer sold 25,304 shares of Walgreens stock for $1,218,893.68; on November 1, 2022, Defendant Brewer sold 9,326 shares of Walgreens stock for $338,160.76; and on March 15, 2023, Defendant Brewer sold 25,301 shares of Walgreens stock for $842,270.29. Overall, Defendant Brewer enriched herself by selling nearly $2.4 million in shares of Walgreens

stock during the Class Period.

226. Defendant Wentworth also sold a large volume of shares during the Class Period. On November 1, 2024, Defendant Wentworth sold 78,142 shares of Walgreens stock for $739,223.32.

227. Defendant Kehoe also made many large sales of shares during the Class Period, as reflected in the following table.

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| June 1, 2020 | 7,777 | $336,744.10 |
| September 1, 2020 | 5,871 | $215,817.96 |
| November 1, 2020 | 3,304 | $112,468.16 |
| June 1, 2021 | 8,918 | $471,227.12 |
| September 1, 2021 | 6,112 | $307,372.48 |
| October 19, 2021 | 15,959 | $766,191.59 |
| November 1, 2021 | 7,705 | $364,600.60 |
| May 1, 2022 | 5,733 | $243,079.20 |
| October 26, 2022 | 24,752 | $878,943.52 |
| November 1, 2022 | 11,678 | $423,444.28 |
| May 1, 2023 | 6,020 | $212,205.00 |

Overall, Defendant Kehoe enriched himself by selling over $4.3 million in shares of Walgreens stock during the Class Period.

228. Defendant Mahajan also made many large sales of shares during the Class Period, as reflected in the following table.

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| October 19, 2021 | 806 | $38,696.06 |
| November 1, 2021 | 397 | $18,786.04 |
| October 26, 2022 | 1,311 | $46,553.61 |
| November 1, 2022 | 815 | $29,551.90 |
| October 25, 2023 | 1,189 | $25,408.93 |
| November 1, 2023 | 2,430 | $51,224.40 |
| October 23, 2024 | 1,331 | $12,444.85 |
| November 1, 2024 | 5,220 | $49,381.20 |

229.    Overall, Defendant Mahajan enriched himself by selling over $200 thousand in shares of Walgreens stock during the Class Period.

### G.    Pharmaceutical Sales Were the Core Operation of Walgreens

230.    Pharmacy sales make up a vast majority of Walgreens' business, and therefore are the core operation of the Company.  The Company's operations are conducted through three reportable segments:  U.S. Retail Pharmacy, International, and U.S. Healthcare.  In fiscal 2024, U.S. Retail Pharmacy sales accounted for 78.40% ($115.8 billion) of the overall segment sales, while International accounted for 15.98% ($23.6 billion) and U.S. Healthcare accounted for 5.62% ($8.3 billion).  Walgreens' U.S. Retail Pharmacy segment is split into sales from two components, Pharmacy and Retail.  According to the most recent 10-K filed with the SEC, pharmacy sales made up 77% of the U.S. Retail Pharmacy sales, and retail sales made up only 23% in fiscal 2024.

231.    Walgreens' pharmacy sales are made up of "the sale of prescription drugs and provision of pharmacy-related services," and so include the sale of opioid prescriptions. Walgreens' opioid dispensing practices were therefore a material part of Walgreens' core operations.

## XI.    CLASS ACTION ALLEGATIONS

232.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Walgreens common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest

233.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Walgreens common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Walgreens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

234. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

235. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

236. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged in this Complaint;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

- whether the prices of Walgreens securities during the Class Period were artificially inflated because of the Defendants' conduct alleged in this Complaint; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

237. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

238. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Walgreens securities are traded in an efficient market;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Walgreens securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

239. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

240. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    COUNT ONE

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

241. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

242. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

243. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walgreens common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Walgreens common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

244. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Walgreens common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Walgreens' finances and business prospects.

245. By virtue of their positions at Walgreens, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

246. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Walgreens, the Individual Defendants had knowledge of the details of Walgreens' internal affairs.

247. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Walgreens. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Walgreens' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Walgreens common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Walgreens' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired Walgreens common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

248.    During the Class Period, Walgreens common stock were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Walgreens common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Walgreens common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Walgreens common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

249.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

250.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XIII.  COUNT TWO

### For Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)

251.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

252.    During the Class Period, the Individual Defendants participated in the operation and management of Walgreens, and conducted and participated, directly and indirectly, in the conduct of Walgreens' business affairs.  Because of their senior positions, they knew the adverse non-public information about Walgreens' misstatement of income and expenses and false financial statements.

253.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Walgreens' financial condition and results of operations, and to correct promptly any public statements issued by Walgreens which had become materially false or misleading.

254.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walgreens disseminated in the marketplace during the Class Period concerning Walgreens' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walgreens to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Walgreens within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Walgreens common stock.

255.    Each of the Individual Defendants, therefore, acted as a controlling person of Walgreens.  By reason of their senior management positions and/or being directors of Walgreens, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Walgreens to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Walgreens and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

256.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Walgreens.

## XIV.  PRAYER FOR RELIEF

257.  WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.  Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged in this Complaint;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## XV.  JURY DEMAND

258.  Plaintiff hereby demands a trial by jury in this Action.

Dated:  July 21, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

*Counsel for Lead Plaintiff Victoriano Toyos*
*and Lead Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)

E-mail:  pkim@rosenlegal.com

*Additional Counsel*

AMENDED COMPLAINT (CASE NO. 1:25-cv-01058-JHL)