**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE KLEIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 25 C 1058 |
| v. | ) ) ) | Judge Joan H. Lefkow |
| WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA, ROSALIND G. BREWER, GINGER GRAHAM, TIMOTHY C. WENTWORTH, JAMES KEHOE, and MANMOHAN MAHAJAN, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs Victoriano Toyos[1] and Steve Klein, individually and on behalf of a putative class, bring this suit against Walgreens Boots Alliance, Inc. (Walgreens), Chief Executive Officer (CEO) Stefano Pessina, CEO Rosalind G. Brewer, Interim CEO Ginger Graham, CEO Timothy C. Wentworth, Chief Financial Officer (CFO) James Kehoe, and CFO Manmohan Mahajan, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5 promulgated thereunder. (Dkt. 40.) Defendants move to dismiss the Amended Complaint pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C §§ 78u-4, *et seq.*, and Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Dkt. 45.) For the reasons set forth below, the court grants defendants' motion. The complaint is dismissed with prejudice.

---

[1] The clerk is directed to update the case caption adding Victoriano Toyos as lead plaintiff, in accordance with the court's order appointing Toyos as such. (Dkt. 35.)

## **BACKGROUND**[2]

Walgreens is a healthcare, pharmacy, and retail company headquartered in Deerfield, Illinois, operating throughout the United States and internationally. Individual defendants Pessina, Brewer, Graham, and Wentworth each served as CEO or interim CEO during the class period, and Kehoe and Mahajan served as CFO at different times during the class period. Plaintiffs are a putative class of all persons and entities other than the defendants who purchased or acquired Walgreens securities between October 15, 2020, and February 27, 2025.

Since the 1990s, the United States has been grappling with a public health crisis stemming from opioid addiction. This crisis grew into a full-blown epidemic and public health emergency, as designated by the Centers for Disease Control and Prevention (CDC) in 2017 and renewed in 2024. According to the CDC, more than 645,000 people in the United States have died from overdoses involving opioids since the start of the epidemic.

During this time, Walgreens, as a pharmacy, filled prescriptions for opioids, and a significant number of these opioid prescriptions were diverted for illicit uses. As such, in 2013, Walgreens reached a settlement with the Department of Justice (DOJ) and the U.S. Drug Enforcement Administration (DEA), resolving allegations concerning Walgreens's failure to comply with the Controlled Substances Act (CSA) by failing to prevent diversion of prescription opioids for abuse and illegal sales (DEA Settlement). As part of the DEA Settlement, Walgreens agreed to pay an $80 million fine and to implement controls that would prevent the diversion of prescription painkillers to the black market.

Moving forward, Walgreens promised it "support[ed its] pharmacists['] right to refuse to fill opioid prescriptions." (Dkt. 40 ¶ 7.) It detailed to its investors its "good faith dispensing

---

[2] Plaintiffs' well-pleaded allegations are taken as true. *Chaidez* v. *Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

policy." (Dkt. 40 ¶ 8.) It promised it used "technology to help pharmacists ensure that they were dispensing legitimate prescriptions." (Dkt. 40 ¶ 9.) And it promised it was complying with pharmacy and healthcare laws such as the CSA and the False Claims Act (FCA). In its 2019 shareholder-commissioned Board Report on Oversight of Risk Related to Opioids, the Board explained its multiple mechanisms and programs aimed at fulfilling these promises and ensuring compliance related to prescribing opioids.

Yet there were signs that perhaps these mechanisms were not functioning as they should and that defendants were misleading investors as to the steps Walgreens was taking to combat the opioid epidemic. Plaintiffs allege that Walgreens committed fraud by making "concrete promises to the public that Walgreens was taking specific actions to confront the Opioid epidemic and comply with applicable laws, but these promises were flatly misleading." (Dkt. 40 ¶ 6.)[3]

In May 2022, Walgreens announced it reached an opioid settlement with the State of Florida for $683 million to resolve all claims related to the distribution and dispensation of prescription opioids in its Florida pharmacies. In August 2022, a court in the Northern District of California found Walgreens was liable for "dispens[ing] hundreds of thousands of red flag opioid prescriptions" between 2006 and 2020 and thereby contributed to and was partly liable for the opioid epidemic in San Francisco (California Action). (Dkt. 40 ¶ 63.) A few days after this finding, a court in the Northern District of Ohio ordered Walgreens to pay $650 million over 15 years to two Ohio counties after a jury found Walgreens liable for contributing to the opioid

---

[3] For example, in Walgreens's Code of Conduct and Business Ethics, which Walgreens incorporated into annual reports to the SEC, Walgreens represented that the company complied with healthcare laws and did not engage in illegal or fraudulent healthcare payments or practices. Plaintiffs assert this was a misrepresentation because Walgreens "rampantly violated the CSA and FCA" when it knowingly filled millions of prescriptions for controlled substances without a legitimate medical purpose and then sought reimbursement for many of those prescriptions from federal healthcare programs. (Dkt. 40 ¶ 148.)

epidemic by "knowingly engag[ing] in unlawful conduct by dispensing opioids without effective controls and procedures to guard against diversion" (Ohio Action). (Dkt. 40 ¶ 71.)

In November 2022, Walgreens announced that it agreed to a multi-state opioid settlement resolving claims that Walgreens mishandled opioid prescriptions (Multi-State Settlement). As part of the Multi-State Settlement, Walgreens would pay about $4.95 billion over 15 years. On January 5, 2023, Walgreens filed its Quarterly Report on Form 10-Q with the Securities and Exchange Commission (SEC), reporting on its financial and operations results for the fiscal quarter that ended on November 30, 2022 (the 10-Q). The 10-Q disclosed a $3.7 billion loss caused by "a $5.2 billion, after-tax charge in the quarter that ended Nov. 30 for opioid-related litigation." (Dkt. 40 ¶ 180.) NPR published an article on the same date titled, "Opioid settlement pushes Walgreens to a $3.7 billion loss in the first quarter." (Dkt. 40 ¶ 180.)

As plaintiffs put it in their complaint, "[t]he truth that Walgreens had again been misleading the public about its responses to the opioid crisis was partly revealed, and the risks Walgreens concealed with its misleading statements materialized, over a series of disclosures," beginning with the January 5, 2023, 10-Q. (Dkt. 40 ¶ 11, 149.) Plaintiffs allege that through such "partial corrective disclosures, and materializations of concealed risks, investors … learned of the artificially [*sic*] inflation of the prices of Walgreens common stock." (Dkt. 40 ¶ 179.) Indeed, "[f]ollowing the publication of the Q1 2023 10-Q, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Walgreens' stock price fell by $2.30 per share, or 6.13%, to close at $35.19 per share on January 5, 2023." (Dkt. 40 ¶ 182.)

Additional revelations that Walgreens had been misleading the public and its investors include the Tenth Circuit's June 27, 2023, holding which allowed a case alleging that opioid

overdoses could be traced to Walgreens's failure to flag the large number of pills prescribed to individuals to go forward; two 2024 settlement agreements, totaling $190 million, with the cities of Philadelphia and Baltimore concerning opioid prescriptions; and the January 17, 2025, DOJ announcement that it filed a civil complaint against Walgreens alleging that the company had knowingly filled millions of unlawful prescriptions in violation of the CSA and then sought reimbursement for many of those prescriptions from federal health care programs in violation of the FCA.

Plaintiffs filed their initial complaint on January 30, 2025. They filed an amended complaint on July 21, 2025, in which they allege defendants misrepresented or omitted information related to Walgreens's opioid dispensing policies and practices, thereby violating Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) justifiable reliance by plaintiffs; (5) economic loss; and (6) loss causation. *Lowry* v. *RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 659 (N.D. Ill. 2021) (citing *Pension Tr. Fund for Operating Eng'rs* v. *Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018)).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards* v. *Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff must establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678

(2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). In reviewing such a motion, the court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in a plaintiff's favor. *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted). To survive a Rule 12(b)(6) motion, a complaint must be well-pleaded, meaning it contains sufficient factual detail, accepted as true, to state a plausible claim for relief that rises above the speculative level. *See Iqbal*, 556 U.S. at 678 (2009).

## ANALYSIS

Plaintiffs allege Walgreens violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making misrepresentations and omissions in connection with the purchase of Walgreens stock. Section 10(b) forbids "any manipulative or deceptive" conduct "in connection with the purchase or sale of any security." *Macquarie Infrastructure Corp.* v. *Moab Partners, L. P.*, 601 U.S. 257, 260 (2024) (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 prohibits making "'any untrue statement of a material fact' [and] prohibits omitting a material fact necessary 'to make the statements made … not misleading.'" *Id*. at 263 (quoting 17 C.F.R. § 240.10b–5(b)).

Defendants raise several arguments opposing plaintiffs' claims, beginning by arguing the claims are time-barred based on plaintiffs' own allegations. Although plaintiffs have no obligation to address affirmative defenses in their complaint, they may plead themselves out of court by alleging facts that show they have no claim. *Ludlow* v. *Nw. Univ.*, 79 F. Supp. 3d 824, 837 (N.D. Ill. 2015) (quoting *Soo Line R.R. Co.* v. *St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997)). Thus, while courts generally do not resolve statute of limitations issues at the motion to dismiss stage, they may adjudicate such issues "definitively on the face of the complaint when the plaintiff pleads too much and admits definitively that the applicable limitations period has

expired." *Barry Aviation Inc.* v. *Land O'Lakes Municipal Airport Comm'n.*, 377 F.3d 682, 688 (7th Cir. 2004); *see, e.g.*, *Howe* v. *Shchekin*, 238 F. Supp. 3d 1046 (N.D. Ill. 2017).

Claims under Section 10(b) of the Exchange Act may be brought until "the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Construing this limitations statute, the Supreme Court held that, under Section 1658(b), "the cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first." *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 637 (2010) (cleaned up). "[F]acts constituting the violation include the fact of scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (cleaned up).

As to what "violation" means in this context, *McCann* v. *Hy-Vee* is instructive. 663 F.3d 926 (7th Cir. 2011). In *McCann*, the Seventh Circuit analyzed both (b)(1) and (b)(2) of Section 1658 in answering whether "violation" meant "when the fraud was committed or when the fraud caused a loss." *Id.* at 930. Though the holding itself concerned only (b)(2), the court reasoned that "the two-year deadline [under (b)(1)], like the five-year deadline [under (b)(2)], runs from the date of the *fraud* rather than the date of the *injury*." *Id.* at 932 (emphasis added). In affirming the dismissal of the action as time-barred, the court thus looked to when the alleged misrepresentation occurred and when the plaintiff discovered (or a reasonably diligent plaintiff would have discovered) the misrepresentation, not when the injury resulting from the misrepresentation occurred. *Id.* at 930–31.

Plaintiff's initial complaint was filed on January 30, 2025. If a reasonably diligent plaintiff would have discovered the fraud prior to January 30, 2023, the complaint is time-barred and must be dismissed. *Robinson* v. *Doe*, 272 F.3d 921, 922 (7th Cir. 2001) ("The statute of

7

limitations in a suit based on federal law, as this one is, stops running when the complaint is filed.").

By plaintiffs' own words in their complaint, "[t]he truth that Walgreens had again been misleading the public about its responses to the opioid crisis was partly revealed, and the risks Walgreens concealed with its misleading statements materialized, over a series of disclosures," beginning with the January 5, 2023, 10-Q. (Dkt. 40 ¶¶ 11, 149.) Defendants thus argue that plaintiffs' own allegations show that the information necessary to bring plaintiffs' claims was available to a reasonable investor before January 30, 2023, as investors were made well-aware by the January 5 disclosure that Walgreens faced billions of dollars in liabilities for claims related to its opioid dispensing practices, which contradicted the company's public statements about the legality of its opioid dispensing practices.

In their complaint, plaintiffs also pointed to the years of opioid-related litigation and settlements to show that defendants knew Walgreens was not complying with the CSA and FCA—alleging the element of scienter. Specifically, plaintiffs point to the findings on August 10, 2022, in the California Action and on August 17, 2022, in the Ohio Action that Walgreens was liable for contributing to the opioid epidemic to show that defendants "knew Walgreens was failing to comply with healthcare laws." (Dkt. 40 at 71.) These allegations show plaintiffs had sufficient information to allege the necessary scienter aspect of their claims prior to January 30, 2023. *See Merck*, 559 U.S. at 637.

In response, plaintiffs "concede that the alleged disclosures on January 5, 2023, and June 27, 2023, did not cause [their] losses and cannot serve as viable loss causation dates for the purposes of their Section 10(b) claims." (Dkt. 48 at 41.) Instead, they argue, their first viable loss causation date is January 17, 2025, when the DOJ announced it filed a civil complaint against

Walgreens, setting forth extensive facts uncovered during its investigation, and giving rise to their claims. As such, they assert, filing on January 30, 2025, placed them well within the limitations period.

Plaintiffs' argument misses the point.[4] As explained above, the clock for fraud claims does not start when the loss or injury occurred. It starts when a reasonably diligent investor should have known that the company was making material misrepresentations. *See McCann*, 663 F.3d at 932. Plaintiffs themselves say more than once in their complaint that the "truth" of Walgreens's "misrepresentations" was publicly revealed on January 5, 2023, via the 10-Q filing. (Dkt. 40 ¶¶ 11, 149.) And even if an investor had missed the filing (which a reasonably diligent investor would not have), it was accompanied by a splashy NPR article the same day announcing the enormous opioid-related losses. *Cf. Tomlinson* v. *Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 847 (N.D. Ill. 2009), *aff'd sub nom. Premium Plus Partners, L.P.* v. *Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011) (holding news articles put investors on inquiry notice regarding potential Commodity Exchange Act claim). If this were not enough to get a Walgreens investor's attention, perhaps Walgreens's stock price decreasing by $2.30 per share, or 6.13 percent, on the day the 10-Q was filed would have. Indeed, as plaintiffs acknowledge, it was through such "partial corrective disclosures, and materializations of concealed risks, investors … learned of the artificially [*sic*] inflation of the prices of Walgreens common stock." (Dkt. 40 ¶ 179.) In other words, investors became aware of the fraud.

---

[4] Plaintiffs may not amend their complaint by arguing that the complaint does not mean what it says. It is "well-settled that a party is bound by what it states in its pleadings." *Soo*, 125 F.3d at 483. "[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Id.*; *see also Early* v. *Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) (explaining that a plaintiff defending against a motion to dismiss may allege facts *consistent* with the complaint).

This was more than enough to put any reasonably diligent investor on their guard that Walgreens had been misrepresenting its opioid dispensing practices. In addition, these events were sufficient for a reasonably diligent plaintiff to have discovered that defendants were engaged in and aware of the alleged fraud prior to January 30, 2023, satisfying the scienter aspect of the violation. Plaintiffs needed to have filed their complaint by January 5, 2025. They failed to do so, and their claims are thus time-barred.

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion to dismiss plaintiffs' complaint is granted. Plaintiffs' claims against defendants are dismissed with prejudice. Civil case terminated.

Date: May 12, 2026

_____
U.S. District Judge Joan H. Lefkow